## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GARY COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 16 CV 3519 |
| | ) | |
| The CITY OF CHICAGO, Illinois, a | ) | Judge Matthew Kennelly |
| municipal corporation, and Chicago Police | ) | |
| Officers KATHLEEN A. CLYNE #9821, | ) | |
| KEN A. JA #15115, KATHY L. SCHNEIDER | ) | |
| #8053, VASILIOS H. PAPADOPOULOS | ) | |
| #18997, and ROBERT SCHMIDT #897 | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' AMENDED COMBINED MOTION FOR JUDGMENT AS A MATTER OF LAW AND MOTION FOR NEW TRIAL AND TO ALTER/AMEND JUDGMENT

NOW COME Defendants, CITY OF CHICAGO, KATHLEEN CLYNE, KEN JA,

KATHY SCHNEIDER, VASILIOS PAPADOPOULOS, and ROBERT SCHMIDT

("Defendants" or "Defendant Officers"), by and through their attorneys, and hereby submit their

Amended[1] Motion for Judgment as a Matter of Law under Fed. R. Civ. P. 50 or, in the alternative,

Motion for A New Trial or to Alter/Amend Judgment under Fed. R. Civ. P. 59, and in support

thereof, state as follows:

## LEGAL STANDARD

Rule 50(a)(2) provides: "A motion for judgment as a matter of law may be made at any time

before the case is submitted to the jury. The motion must specify the judgment sought and the law

and the facts that entitle the movant to the judgment." If a Rule 50(a) motion made at the close of

evidence is not granted, the movant may renew the motion within 28 days after the entry of

judgment. Fed. R. Civ. P. 50(b). Rule 50 "allows a district court to enter judgment against a party

---

[1] Pursuant to Dkt. 152, Defendants were granted leave to file a brief of no more than 25 pages. Dkt. No. 152.

who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally

sufficient evidentiary basis to find for the party on that issue.'" *Passanati v. Cook Cnty.*, 689 F.3d 655,

659 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(a)).

Rule 59(a) provides that "[t]he court may, on motion, grant a new trial on all or some of the

issues – and to any party –…after a jury trial, for any reason for which a new trial has heretofore

been granted in an action at law in federal court…" *Id.* A court can order a new trial "if the jury's

verdict is against the manifest weight of the evidence,…or if for other reasons the trial was not fair

to the moving party." *Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012). Courts may grant Rule 59(e)

motions to alter or amend the judgment if the movant points to evidence in the record that clearly

establishes a manifest error of law or fact. *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir.

2012). "A 'manifest error' occurs when the district court commits a wholesale disregard,

misapplication, or failure to recognize controlling precedent." *Burritt v. Ditlefsen*, 807 F.3d 239, 253

(7th Cir. 2015).

## ARGUMENT

### I.     A New Trial Should Be Granted As a Result Of Substantial Errors In The Exclusion of Material Evidence.

This Court should grant Defendants' Motion for a new trial because there were substantial

evidentiary errors prohibiting Defendants' presentation of material evidence on some of the most

probative issues in this case. A new trial is warranted where the Court's ruling on the evidence was

erroneous and the error had "a substantial or injurious effect or influence on the determination of a

jury and the result is inconsistent with substantial justice." *Lewis v. City of Chic. Police Dep't*, 590 F.3d

427, 440 (7th Cir. 2009).

First, this Court's rulings prohibiting Defendants from impeaching Plaintiff's testimony that

he was denied a recognizance bond with either Sgt. Lamberty's testimony or admission of a portion

of the arrest report deprived Defendants of a fair trial on both liability and damages. Second, this

Court's granting of Plaintiff's Motion *in limine* No. 3, barring evidence related to Plaintiff's representation of himself as a "sovereign citizen" (and attendant misrepresentation of his identity) during his criminal trial, similarly deprived Defendants of a fair trial by preventing Defendants from presenting evidence: (1) that was relevant to Plaintiff's general veracity as a witness; and (2) directly probative of Plaintiff's underlying violent resistance during the incident.

These rulings (independently and in concert with each other) warrant a new trial as their prejudicial effect was not harmless. *See Cobige v. City of Chic.*, 651 F.3d 780, 785 (7th Cir. 2011) (remanding for based on "error in excluding evidence that could have significantly reduced the award of damage" because "[t]he district court should not have forbidden evidence that would have helped defendants counter [the plaintiff's] presentation"); *Parish v. City of Elkhart, Inc.*, 702 F.3d 997, 1003 (7th Cir. 2012) (remanding for new trial because "the district court's ruling improperly limited the introduction of evidence relating to Parish's innocence, and that evidence was critical to the damages issue, the award of damages cannot stand.").

### A. As a Result of this Court's Pretrial Rulings, Defendants Were Improperly Prevented From Attacking Plaintiff's Testimony.

In this case, Defendants sought to introduce evidence showing Plaintiff's testimony that he was denied a recognizance bond and as a result spent six days in jail was false. *See* Group Ex. 1, Excerpts of Trial Trans. at pp. 459:25-460:14. However, this Court's pretrial rulings prevented Defendants from rebutting this testimony. Specifically, Defendants were prohibited from calling Lamberty to offer impeachment testimony on this issue. Group Ex. 2, Excerpts of 2-8-18 Pretrial Trans. at p. 42. Also, Defendants were prevented from entering the portion of the police report which reflects that Lamberty offered the bond and Plaintiff refused. *Id.* at p. 10:9-14. Consequently, a new trial is warranted to correct these errors and ensure a fair trial.

### 1. Lamberty should have been allowed as an impeachment witness.

This Court erred when it ruled that Defendants were prohibited from calling Lamberty as a witness. *Id.* at p. 42. Lamberty offered Plaintiff a recognizance bond that would have allowed him to go home after just a few hours, rather than six days, and documented that interaction. Ex. 3, 3-16-18 Aff. of Sgt. Lamberty at ¶ 5; Ex. 4, Arrest Report HLO000001-HLO000005; Ex. 5, 1-19-17 Aff. of Sgt. Lamberty; *see also* Ex. 1 at pp. 459:25-460:6. However, this Court barred Lamberty from testifying at trial because it found Plaintiff was "led to believe that [Lamberty] had no information." Ex. 2 at p. 42. This ruling was erroneous. Plaintiff was in possession of the arrest report in this case well before discovery was even initiated, and was fully aware that Lamberty reported therein that he had offered Plaintiff a recognizance bond but that Plaintiff refused to sign. Moreover, Lamberty was solely being called for impeachment purposes, and thus he need not be disclosed (although he was disclosed both under Rule 26(a) and in the final pretrial order). Therefore, this Court should have allowed Defendants to call Lamberty at trial, effectively impeaching Plaintiff's false testimony on this specific issue. Lamberty's testimony would have shown that Plaintiff's claim that he was denied a recognizance bond was not true. *See* Ex. 3 at ¶ 10; *White*, 2009 WL 4215096, at *2-3.

This Court's finding that it would be "unfair" to allow Defendants to call Lamberty because Plaintiff was "lead to believe that the guy had no information" is incorrect. Ex. 2 at p. 42:14-16. Plaintiff had the arrest report which he used the report to draft Lamberty's affidavit. *See* Ex. 4; Ex. 5. Indeed, Plaintiff specifically cites the time Lamberty approved criminal charges. Ex. 5 at ¶ 5. Page 5 of the arrest report is the only place where that particular information is contained in discovery. Ex. 4 at p. HLO000005. That same page also reflects that Lamberty reported: "SUBJECT REFUSES TO SIGN RECOGNIZANCE BOND." *Id.* There is no basis to conclude that Plaintiff did not have this information. He indisputably did.

Nor does the correspondence related to the preparation of the affidavit mislead Plaintiff by somehow suggesting Lamberty's involvement with Plaintiff was limited to the final approval of

charges. *See* Group Ex. 6, Correspondence related to preparation of Ex. 5. Plaintiff's counsel actually prepared the affidavit. While Defendants did review prior versions of the affidavit Plaintiff prepared, at no time did any versions of the affidavit discuss this particular issue. *Id.* Defendants never removed the information or suggested Plaintiff do the same. *Id.* Indeed, there was no discussion related to this particular piece of information. Thus, there is nothing to suggest that Defendants mislead or hid this information from Plaintiff. *See id.* The simple fact is that Plaintiff decided not to include it in the affidavit he prepared, despite readily having the information. That is not a basis to prohibit Defendants from calling Lamberty as a witness to impeach Plaintiff on this issue.

Plaintiff's admonition that Lamberty would have been deposed in this case is also misleading. Plaintiff deposed three officers in this case (who were later dropped as defendants), a lockup keeper, and an OEMC representative. Plaintiff did not depose a single Defendant Officer, including Schneider, who never testified during the criminal proceedings. Plaintiff also did not depose Defendants' expert, Robert Johnson; the landlord; Sgt. Neary, who released Plaintiff to go to the hospital; Officer Nadela who searched Plaintiff and received him at the lock up when upon return from the hospital; Officer Biritz who took Plaintiff to the hospital; or Lock-up Keeper Slowik. To maintain that he was unfairly prejudiced because he would have deposed Lamberty had Lamberty not signed the affidavit is disingenuous.

Moreover, Lamberty's testimony should have been allowed, at minimum, for direct impeachment of Plaintiff's testimony. *See* Ex. 3. Rule 26(a) does not require disclosure of impeachment witnesses. Fed. R. Civ. P. 26(a); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005); *Moore v. City of Chic.*, No. 02 C 5130, 2008 WL 4549137, * (N.D. Ill. April 15, 2008). Any arguable prejudice Plaintiff experienced because he decided to forego Lamberty's deposition is illusory. As Lamberty's testimony was solely for impeachment of Plaintiff's testimony on this one issue, there was no requirement to disclose him in the first instance. Had Lamberty never been

disclosed, Plaintiff would not have the affidavit of Lamberty, let alone a deposition, and would have been in the same (or worse) position than he was prior to the start of trial.

As a result, Defendants were unable to impeach Plaintiff which had a considerable injurious effect both in being unable to challenge his credibility, and with regard to the damages Plaintiff was able to obtain under the false pretense of being forced to remain in lockup. A new trial is necessary to correct this error and ensure a complete record is presented to the jury.

## 2. The Arrest Report "WC Comments" fall within hearsay exceptions.

This Court's evidentiary finding that police reports are inadmissible hearsay that was not subject to any exception was also incorrect. Ex. 2 at p. 10:9-14. The Court's ruling on this issue barred Defendants from entering into evidence the WC Comment of the Arrest Report. That section is admissible under Rule 803(8), (6), and (5). *See* Ex. 4 at p. HLO000005; Fed. R. Evid. 803(5), (6), and (8). As a result, Defendants should have been allowed to present it as substantive evidence. The Court's refusal to allow this evidence merits a new trial as it prevented the impeachment of Plaintiff on a key issue as well as challenging his alleged damages.

First, the portion of the Arrest Report is admissible under Rule 803(8) as a public record. In civil cases, Rule 803(8) creates an exception to the hearsay rule for "a matter observed while under a legal duty to report..." *See* Fed. R. Evid. 803(8). This exception expressly governs matters encompassed by reports completed by law enforcement in the scope of their duties. *See Truesdale v. Klich*, No. 03 C 8209, 2006 WL 1460043, at *3 (N.D. Ill. May 23, 2006) ("In a civil case, police reports may be admissible as a public record or business record."); *Lockhart ex rel. Lockhart v. Archer*, No. 03 C 3760, 2004 WL 1459338, at *1 (N.D. Ill. June 25, 2004); *Salmi v. D.T. Mgmt., Inc.*, No. 02 C 2741, 2002 WL 31115581, at *2 (N. D. Ill. Sept. 23, 2002) (citing Rule 803(8) and noting that "[b]ecause this is a civil-not a criminal-matter, a police officer's statements of facts and observations in his report are admissible."); *Roth v. Nat'l R.R. Pass. Corp.*, No. 97 C 6503, 1999 WL 1270706, at *1

(N. D. Ill. Dec. 29, 1999). The WC Comments sets out Lamberty's activities. Ex. 3 at ¶¶ 3, 5-7, 12. Lamberty's offering of the bond and Plaintiff's refusal to sign the same were observed by Lamberty while under a legal duty to report that information. *Id.* at ¶¶ 6, 7, 10, 11. There is no evidence that the source of the information or other circumstances indicate a lack of trustworthiness. Thus, Defendants would have been able to satisfy the requirements for 803(8) to apply.

Second, this portion is also admissible as a business record under Rule 803(6). Under governing law, police reports, such as this arrest report, are admissible under this hearsay exception. *See Roth*, 1999 WL 1270706, at * 1 (police reports could be admissible under Rule 803(6)); *Latosky v. Strunc*, No. 08-C-771, 2009 WL 1073680, at *4 (E.D. Wis. Apr. 21, 2009) ("The business records exception to the hearsay rule set forth in Fed. R. Evid. 803(6) has been found applicable to police reports."); *Dertz v. City of Chic.*, No. 94 C 542, 1998 WL 61194, at *3 (N.D. Ill. Feb. 5, 1998) (denying motion *in limine* to bar police reports because "They appear to be within Rule 803(6), removing them from the category of inadmissible hearsay"); *McKinney v. George*, 556 F. Supp. 645, 649 (N.D. Ill. 1983), aff'd, 726 F.2d 1183 (7th Cir. 1984). This is a record made at or near the time Lamberty offered Plaintiff the recognizance bond and he refused. Ex. 3 at ¶ 11. The arrest report was kept in the course of regularly conducted activity of the Chicago Police Department. *Id.* at ¶ 12. Making the record of offering the bond and Plaintiff's refusal was a regular practice of the Chicago Police Department and of Lamberty at that time. *Id.* at ¶¶ 6, 7, 12. Lamberty is a qualified witness to offer this foundation as the declarant as reflected by his PC number. Ex. 4 at p. HLO000005. And finally, Plaintiff has suggested no evidence that the source of information or the circumstances of preparation indicate a lack of trustworthiness. Thus, Defendants would have been able to satisfy the requirements for 803(6) to apply.

Finally, this portion is admissible under Rule 803(5) as past-recollection recorded. *See United States v. Green*, 258 F.3d 683, 689 (7th Cir. 2001); *Sadrud-Din v. City of Chic.*, 883 F. Supp. 270, 274

(N.D. Ill. 1995); *U.S. v. Lewis*, 954 F.2d 1386, 1395 (7th Cir. 1992). The fact that Lamberty offered Plaintiff a recognizance bond which Plaintiff refused was a matter on which Lamberty once knew about but cannot now recall well enough to testify fully and accurately. Ex. 3 at ¶¶ 8, 10, 11. This portion of the report was written by Lamberty when the matter was fresh in his memory. *Id.* at ¶ 11. Finally, it accurately reflects Lamberty's knowledge. Ex. 3 at ¶ 11. Thus, Defendants would have been able to satisfy the requirements for 803(5) to apply.

As case authority clearly instructs this portion of the Arrest Report could have been allowed into evidence under at least three separate exceptions to the hearsay rule, and such foundation could have been laid, this Court was incorrect in prohibiting Defendants from attempting to do so. The prejudicial effect of this ruling was substantial as it prevented Defendants from impeaching Plaintiff on a crucial issue and from presenting evidence refuting his entitlement to "loss of liberty" damages.

### B. The Barring of Evidence That Plaintiff Represented Himself as a "Sovereign Citizen" (And Misrepresented His Identity) Was Erroneous.

This Court erred in granting Plaintiff's Motion *in limine* No. 3, prohibiting mention of the fact that during Plaintiff's criminal trial proceedings he represented himself as a Sovereign Citizen. Dkt. No. 104 at p. 3. In its ruling, this Court concluded that this line of cross examination was prohibited under Rule 403. *Id.* This error entitles Defendants to a new trial.

Due to the Court's ruling, Defendants were prevented from inquiring that when in criminal court, Plaintiff either: (1) truthfully represented himself as a sovereign citizen, or (2) knowingly misrepresented his identity in an effort to try to benefit himself in his criminal case. Specifically, when asked by the criminal court if he was "Gary Cooper," Plaintiff responded that "I'm an individual who deserves his rights at all times under Uniform Commercial Code 1-308." Dkt. 91-3 at p. 2. Then, when asked by the court if he is "a human being who goes by the name of Gary Cooper," Plaintiff responded: "Of a name similar. And I'm executor director and sole shareholder

of that being." *Id.* at 2-3. Further, Plaintiff asked the Judge "Are you or are you not a public servant? […] Making you a person who does the duty for the public?" *Id.* at p. 4.

When questioned about these statements during his deposition, Plaintiff explained that he made these statements at the criminal trial because he thought that "it will help me" or would "benefit" him at trial. If true, Plaintiff knowingly decided to proceed in court making false statements because "you have to do whatever you can." Ex. 7, Excerpt of Plaintiff's Depo. at p. 228:19-20. This information would directly call into question Plaintiff's character for truthfulness in the very proceeding at issue in this case. Such dishonesty is of paramount importance and Defendants should have been allowed to present this information to the jury. Thus, this Court's ruling on Plaintiff's Motion *in limine* No. 3, preventing Defendants from exploring these issues, was erroneous and highly prejudicial.

Evidence of Plaintiff's self-identification as a "sovereign citizen" is directly relevant to his actions toward these officers forming the basis for this lawsuit: his violent and resistant actions toward the lawful orders of law enforcement. "Sovereign citizens are anti-government extremists who believe that even though they physically reside in this country, they are separate or 'sovereign' from the United States. As a result, they believe they don't have to answer to any government authority, including courts [...] or law enforcement." Federal Bureau of Investigation, "Sovereign Citizens: An Introduction for Law Enforcement" 3 (Apr. 2010), http://info.publicintelligence.net/FBI-SovereignCitizens.pdf (visited March 13, 2018). The basic tenets of this group have been repeatedly recognized by the Courts as espousing beliefs that "the state and federal governments lack constitutional legitimacy and therefore have no authority to regulate their behavior." *U.S. v. Ulloa*, 511 Fed. App'x 105, 108 (2d Cir. 2013)

Given Plaintiff's subscription to the beliefs of this group on the record, Defendants should have been allowed to inquire whether Plaintiff subscribed to those beliefs in general and acted in

compliance with them on the day in question. If he believes that he is not subject to law enforcement, such evidence lends support to the Defendants' version and contradicts Plaintiff's trial testimony in every material respect. Specifically, it is highly probative of whether he resisted arrest and lawful commands as the Defendants testified. It was also relevant to both bias against law enforcement and motive to resist under Fed. R. Evid. 404(b).

The Supreme Court has found that subscription to tenets of such organizations is highly probative and admissible. *See U.S. v. Abel*, 469 U.S. 45, 48 (1984) (evidence that party was a "member[] of a secret prison organization whose tenets required its members to deny its existence and 'lie, cheat, steal [and] kill' to protect each other" was admissible). Indeed, it has specifically held that "[a] witness' and a party's common membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias." *Id.*; *see also Martinez v. City of Chic.*, 2009 WL 3462052, *4 (N.D. Ill. Oct. 23, 2009); *U.S. ex rel. Hairston v. Warden*, 597 F.2d 604, 607-08 (7th Cir. 1979); *U.S. v. Montgomery*, 390 F.3d 1013 (7th Cir. 2004); *U.S. v. Wray*, 664 F. App'x 160, 162 (3d Cir. 2016); *Ulloa*, 511 F. App'x at 108; *U.S. v. Bell*, 585 F. App'x 552, 553 (9th Cir. 2014) (admission of evidence of sovereign citizen membership relevant to refusal to recognize law enforcement); *U.S. v. Howard*, 2010 WL 276236, at *2 (W.D. Wash. Jan. 20, 2010).

Second, even were Plaintiff's deposition testimony to be believed (i.e. that he did not really subscribe to this group and merely used their teachings to benefit himself in his criminal case), the admissibility of this evidence is perhaps even more compelling because it is direct evidence of dishonesty in connection with the criminal proceedings at issue. Plaintiff's statements to the judge were tantamount to lying about his very identity. Defendants should have been allowed to examine Plaintiff on this issue to call into question his character for truthfulness.

"Various types of impeachment are allowed, despite the recognition that the subject-matter of the impeachment could not be used substantively, precisely because a witness' credibility is always

an important consideration. Impeachment by prior inconsistent statement is one example; another is the type of impeachment at issue here—an attack on a witness' character for truthfulness through cross-examination as to specific instances of the witness' previous conduct (which, of course, have not been the subject of his direct examination)." *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F2d 581, 605 (7th Cir. 1985) (abrogated on other grounds); *see also U.S. v. Green*, 617 F.3d 233, 251 (3d Cir. 2010) (explaining that "evidence concerning a witness's credibility is always relevant, because credibility is always an issue."). "The reason for allowing cross-examination under Rule 608(b) is to allow a party to attempt to cast doubt on a witness's reliability for telling the truth." *Varhol v. Nat'l R.R. Pass. Corp.*, 909 F.2d 1557, 1567 (7th Cir. 1990); *see also U.S. v. Miles*, 207 F.3d 968, 993 (7th Cir. 2000).

The fact that Plaintiff specifically misrepresented who he was in order to try to obtain an improper benefit in his criminal trial is of critical importance as it is akin to using a false name to mislead law enforcement. *See Thompson v. City of Chic.*, 722 F.3d 963, 977-78 (7th Cir. 2013) (that evidence that a plaintiff has misidentified himself to law enforcement may properly be admitted under 608(b), without tipping the 403 balancing test). Thus, this Court's order preventing examination about how Plaintiff lied about his own identity by representing himself as a sovereign citizen under Rule 403 was error. *See id.* at 977-978; *see also U.S. v. Burts*, 108 Fed. Appx. 389, 392 (7th Cir. 2003) (noting that admission of testimony that the defendant used a false name when arrested was not inadmissible under Rule 403).

This case essentially was a dispute about the credibility of the parties. Evidence which directly speaks to one side's credibility as a witness is highly probative and would have been critical for the jury's evaluation. Any possible prejudicial effect of this evidence would not have substantially outweighed the probative value given the importance of credibility issues of parties in this case. This Court's ruling, depriving Defendants the opportunity to explore this information on cross examination, was highly prejudicial and warrants a new trial under Rule 59.

## II.    A New Trial Is Required Because The Jury's Verdict Is Inconsistent.

This Court should also grant a new trial under Rule 59 because the jury's verdict is internally inconsistent in several respects. "[W]hen jury verdicts are logically incompatible, thereby indicating the jury was confused or abused its power, the district court errs when it fails to order a new trial." *Stone v. City of Chic.*, 738 F.2d 896, 899 (7th Cir. 1984); *see also Thomas v. Stalter*, 20 F. 3d 298, 303 (7th Cir. 1994). While a court "must attempt to reconcile the jury's findings," a court can only harmonize the jury's answers if doing so is "possible under a fair reading of them." *Gallick v. Baltimore & O. R. Co.*, 372 U.S. 108, 119 (1963). The court cannot "treat one verdict [...] as the jury's 'true' disposition to which the other verdict must be confirmed." *Timm v. Progressive Steel Treating, Inc.*, 137 F.3d 1008, 1010 (7th Cir. 1998); *see also Am. Cas. Co. of Reading Pa. v. B. Cianciolo, Inc.*, 987 F.2d 1302, 1305 (7th Cir. 1993) ("[T]here is no priority among inconsistent verdicts – the judge may not assume that the first answer is the 'authentic' one with which later answers must be reconciled.").

First, Ja and Schmidt were found not liable for false arrest, meaning Plaintiff failed to prove probable cause did not exist to arrest him for resisting. Thus, the jury's finding in Plaintiff's favor on the false arrest claims against Clyne, Papadopoulos, and Schneider is inconsistent as logically they also would have had the same probable cause. *See Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 484 (7th Cir. 2011) (where the plaintiff "repeatedly physically rebuffed [the defendant officer's] attempts to grasp him" and then "threw his arms out in what could be construed as a resisting or defensive position" the "undisputed facts suffice to establish that a reasonable officer could have believed that the plaintiff intentionally attempted to resist arrest."). Under the facts presented, this disparity is unexplainable.

Also, the jury's findings against Papadopoulos and Schmidt on the false arrest claims and excessive force claims are inconsistent. The testimony from both sides was that the officers used a range of force to handcuff Plaintiff. *See* Ex. 1 at pp. 268:10-14, 402:24, 460:15-17; 602:1-6; 623:12-

19. The jury apparently found that the use of hands-on force by Papadopoulos and Schmidt was reasonable. But, such force could only have been reasonable if Plaintiff was actively resisting being placed into handcuffs. Accepting that to be true, however, there is no basis to find against any of the Defendants on the false arrest claim, because again, there would have been probable cause to arrest Plaintiff for resisting arrest under these facts.

Finally, the award of punitive damages, when compared and contrasted among each individual Defendant, further support the jury's findings are inconsistent. *See Bank v. Mass. Bay Ins. Co.*, No. 90 C 2005, 1997 W: 619856, at *4 (N.D. Ill. Sept. 30, 1997). For instance, Schmidt was found not liable on three out of the four claims, yet the punitive damages against him are two times as much than Ja, and $25,000 more than Papadopoulos. Dkt. No. 142. Thus, the jury decided to punish Schmidt at the same level as Clyne and Schneider, despite substantially distinct findings of liability. This inconsistency, unsupported by the evidence, suggests the jury acted out of passion or prejudice rather than application of the law, resulting in an inconsistent verdict. Such abuses may be remedied through ordering of a new trial. *See In re Testosterone Replacement Therapy Prod. Liab.*, 2017 WL 6569632 (N.D. Ill. Dec. 22, 2017).

### III.  Schneider, Papadopoulos, and Clyne Should Be Granted Qualified Immunity For The Unlawful Entry Claim.

Defendants renew their motion for Judgment as a Matter of Law for the entry of Qualified Immunity. Qualified immunity protects police officers "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). This protection applies regardless of whether an officer's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* It "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). Indeed, it "protects public employees who make reasonable errors in applying

even clearly established law." *Vinning-El v. Evans*, 657 F.3d 581, 594 (7th Cir. 2011). The burden of defeating an assertion of qualified immunity rests with the plaintiff. *Anderson v. City of West Bend Police Dept*, 774 F. Supp. 2d 925, 949 (W.D. Wisc. 2011). This is "a rather heavy burden, and appropriately so because qualified immunity is designed to shield from civil liability all but the plainly incompetent or those who knowingly violate the law." *Donovan v. City of Mil.*, 17 F. 3d 944, 952 (7th Cir. 1994). Here, the facts support a finding of Qualified Immunity for Defendants on Count I.

### A. Schneider and Papadopoulos Should Be Granted Qualified Immunity as They Reasonably Relied on Clyne Under the Collective Knowledge Doctrine.

It was undisputed that Papadopoulos and Schneider arrived *after* Clyne learned facts leading her to believe violence may be occurring in Plaintiff's unit and she may be needed to protect Plaintiff and/or his girlfriend from imminent harm. Ex. 1 at p. 319:7-21. At the time they arrived, Clyne had already called on the radio that she would be conducting a premises check in Unit 310. *Id.* at pp. 316:8-319:21; 491:5-10, 544:8-23, 596:18-20. Papadopoulos and Schneider relied on Clyne's judgment that she had information supporting the existence of exigent circumstances necessary to potentially provide emergency aid *via* a well-being check. *See id.* at pp. 316:8-319:21, 491:5-10, 514:12-15, 537:2-4, 544:8-23, 596:18-20, 599: 9-16.

Papadopoulos and Schneider reasonably relied upon Clyne's knowledge and conclusions before entering the unit. The collective knowledge doctrine permits an officer to search a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action. *U.S. v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010); *Holmes v. City of Chi.*, 63 F. Supp. 3d 806, 812-13 (N.D. Ill. 2014); *see also U.S. v. Ellis*, 499 F.3d 686 (7th Cir. 2007) (the collective knowledge doctrine can apply to an unlawful entry claim). An officer is entitled to qualified immunity where she is objectively reasonable in relying on information provided by another officer. *White v. City of Chic.*, No. 11-CV-7802, 2015 WL 225395, at *4 (N.D. Ill. Jan. 15, 2015), *aff'd*, 829 F.3d 837 (7th Cir. 2016);

*Wibon v. Plovanich*, 67 F. Supp. 3d 927, 941 (N.D. Ill. 2014) ("the collective knowledge doctrine means a defendant is entitled to qualified immunity if he relied in objective good faith on another officer as to the justification for the [search]"); *Crawford v. City of Chic.*, No. 12 C 5289, 2014 WL 1661720, at *6 (N.D. Ill. Apr. 25, 2014); *Graham v. Blair*, 10 C 772, 2011 WL 6888528, at *6 (S.D. Ill. Dec. 28, 2011).

Based on the undisputed testimony at trial, Schneider and Papadopoulos did not knowingly violate the law, but appropriately relied on an officer in making the entry into the apartment. As such, this Court should grant them qualified immunity on Count I.

### B. Clyne Should Be Granted Qualified Immunity For Her Decision to Enter Plaintiff's Apartment.

Qualified Immunity is also proper for Clyne because the use of her discretion was reasonable given the facts she was presented. The Fourth Amendment's standard regarding warrantless entries recognizes that it is reasonable for police to move quickly if delay could make the situation more dangerous. *City & Cty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015). Police are not expected to act perfectly and the Fourth Amendment permits mistakes, especially when judged from the benefit of 20/20 hindsight. *Id.* (internal citations omitted) (explaining that police are allowed to "make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.").

The United States Supreme Court and this Circuit have held warrantless entries under similar factual scenarios to be lawful. *See, e.g., Michigan v. Fisher*, 558 U.S. 45 (2008) (warrantless entry found to be lawful based on the facts that: the officers responded to a report of a disturbance; they could see evidence of violent behavior in the home; and they did not know if the plaintiff's projectiles might have a human target or if the plaintiff would hurt himself in the course of his rage); *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (finding warrantless entry to be proper where officers responded to a loud party, there was no response to the officers announcing their present, as

officers were not required to "wait until another blow rendered someone unconscious, semi-conscious, or worse before entering."); *Sutterfield v. City of Mil.*, 751 F.3d 542, 573 (7th Cir. 2014) (holding that the officers were entitled to qualified immunity for their entry as the facts objectively supported the emergency aid exception); *see also Hopkins v. City of Sierra Vista, Ariz.*, 931 F.2d 524, 526 (9th Cir. 1991) (an officer did not violate Fourth Amendment after he heard loud noises that may have indicated an argument or social gathering, he knew the male inside was associated with previous violent situations, and the male refused to allow the officer to speak with his wife); *Anderson*, 774 F. Supp. 2d at 950 (warrantless entry was reasonable in light of the exigent circumstances indicating that the threat of domestic violence had not passed even after 20-25 minutes). As in these cases, the evidence at trial provided no support to suggest that Clyne knowingly violated the Fourth Amendment. At worst, Clyne made a mistake in failing to gather more evidence to support the exigency exception to the warrant requirement before entering the apartment. Indeed, as the case law demonstrates, whether the facts known to Clyne leading her to believe she needed to enter the apartment to prevent a potentially dangerous situation was at the very least a close call. As in the cases above, this case demonstrates the very purpose of the doctrine of qualified immunity in protecting reasonable but mistaken judgments by those who did not knowingly violate the law. *Sheehan*, 135 S. Ct. at 1775. Accordingly, Clyne is entitled to qualified immunity on Count I.

## IV. The Punitive Damages Awarded Were Excessive And Unconstitutional.

If this Court does not grant a new trial under Rule 59, remittitur is required because the $425,000 in punitive damages against the Defendants was unreasonable, excessive, and unconstitutional. This Court should set aside the punitive damages awarded as they are not warranted on this record, or at the very least, substantially reduce the award consistent with the facts and law via conditional remittitur. *See Hamilton v. Svatik*, 779 F.2d 383 (7th Cir. 1985) (recognizing

that the district court may set aside a jury's award of punitive damages if it exceeds what is required to serve the objective of deterrence and punishment); *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984) (explaining that where an award of punitive damages are excessive, it is appropriate for the district court to set an appropriate remittitur.").

The Supreme Court has recognized that "in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decisionmaker, serve different purposes." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citing *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432 (2001)). "Punitive damages are a powerful weapon. Imposed wisely and with restraint, they have the potential to advance legitimate state interests. Imposed indiscriminately, however, they have a devastating potential for harm. Regrettably, common-law procedures for awarding punitive damages fall into the latter category." *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 19 (1991) (O'CONNOR, J., dissenting). While punitive damages are allowed, there are procedural and substantive constitutional limitations on such awards. *State Farm*, 538 U.S. at 416. Here, damages awarded exceeded those limitations.

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments." *Id.* "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* (quoting *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 574 (1996)). Thus, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417. "Damages should not go beyond deterrence and become a windfall." *Lenard v. Argento*, 699 F.2d 874, 890 (7th Cir. 1983).

The Supreme Court has expressly stated its concerns over the imprecise manner in which punitive damages are administered. *Id.* Indeed, it has admonished that "[p]unitive damages pose an

acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts," potentially allowing juries to use their verdicts to express biases. *Id.* (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 432 (1994); *Haslip*, 499 U.S. at 59 (O'CONNOR, J., dissenting) (nothing that "[a] State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim."). In this case, both the record and the verdict make clear that the jury acted improperly out of unbridled bias and prejudice. Remittitur is the appropriate remedy to curtail what is unreasonable and grossly excessive in this case.

The record in this case makes clear that the award of punitive damages was not based upon an application of law, but rather it was the result of the "decisionmaker's caprice." *See State Farm*, 538 U.S. at 418 (quoting *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436 (2001)). This was demonstrated throughout the proceedings. For instance, during the first set of juror questions following the testimony of Ja, the following discussion took place:

> **COURT:** "How can [... Gary Cooper] resist in the bathroom facing the wall having one controlled hand in cuffs being held by one on one side, another on the left side and you right behind him?"
>
> Okay. That's, I'll just say, a little on the argumentative side. I am not going to ask that that way.
>
> "Can you explain how you can be kicked from someone who is kneeling down and facing away?"
>
> The question is, is it possible for me to reword those in a way that kind of gets factual testimony out?
>
> **CHERONIS:** I think that the one is argumentative.

Ex. 1 at pp. 676:22-677:10. The juror who submitted this question, continued to submit similarly argumentative questions throughout the trial. The Court also later stated that the presiding juror's handwriting corresponded to some of the written jury questions during trial. *See id.* at pp 1031:18-1032:8. It was the same juror who became the foreperson.

This case is akin to the discussion in *State Farm* where the Court found that the case was "used as platform to expose, and punish" State Farm, condemning it "for its nationwide policies rather than for the conduct directed toward the [plaintiffs]." *State Farm*, 538 U.S. at 420. The jury, as evidenced by their questions and the amounts they assessed, were not using the punitive damages for their express purpose, but rather to condemn police officers for their perceived deficiencies and misconduct throughout the Chicago Police Department, if not nationally.

It is also possible, given that the jury did not find in favor of Plaintiff for all his claims, that like in *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984) it "may have been influenced by the seriousness of the allegations made by [the plaintiff] and, even though it felt that [the plaintiff] had not met his burden of proof, the jury may have been moved by a desire to compensate [the plaintiff] for his possible, though not proven injuries." *McKinley*, 732 F.2d at 1328. The 7th Circuit held this was unreasonably excessive punitive damages necessitating remand to the district court for an appropriate remittitur, the ceiling of which the 7th Circuit suggested would be less than half of what was awarded originally. *Id.* at 1328-29.

Although punitive damages "may be appropriate in some cases to punish a wrongdoer for his or her outrageous conduct and to deter others from engaging in similar conduct, such award must be supported by the record and may not constitute merely a windfall to the prevailing party." *Ramsey v. Am. Air Filter Co, Inc.*, 772 F.2d 1303, 1314 (7th Cir. 1985). Review of such awards are to ensure that they are based upon an application of the law. *See State Farm*, 538 U.S. at 418. In light of the concerns that indiscriminately imposed punitive damages have a devastating potential for harm, the *Gore* Court instructed the consideration of three guideposts:

> (1) The degree of reprehensibility of the defendants' misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.

*Gore*, 517 U.S. at 575; *see Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004) (evaluating the reasonableness of a punitive damages award under *Gore's* "three guideposts").

An analysis of these factors makes clear that jury's clear unfettered bias was borne out in unreasonably excessive and illogical punitive damages awards. The resulting verdict represents precisely the concerns warned of by the Supreme Court, which can and should be remedied by through setting aside the punitive damages, or at the very least setting a substantial remittitur.

### A. Degree of Reprehensibility Weighs in Favor of the Individual Defendants.

"[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Gore*, 517 U.S. at 575. The Supreme Court instructs courts to consider multiple facts as part of this analysis, including "whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malic, trickery, or deceit, or mere accident." *Id.* at 576-77. "The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." *State Farm*, 538 U.S. at 419. An evaluation of these considerations supports that the punitive damages are unreasonable in this case and as such should be vacated by this Court.

There was no evidence that the conduct at issue involved repeated actions. There was no testimony Defendants conduct was anything other than an isolated incident. For both Ja and Schmidt, for the jury to find in favor for them on the unlawful entry claim, they had to believe these officers were responding to a call for help from fellow officers, supporting that their actions were out of at worst mistake rather than intentional malice. With respect to Papadopoulos and Schneider, the evidence for the unlawful entry claim does not support they acted with indifference, intentional

malice or trickery. They arrived as Clyne was knocking and relied on her judgment. *See* Ex. 1 at pp. 316:8-319:21, 491:5-10, 514:12-15; 537:2-4, 544:8-23, 596:18-20, 599:9-16. Also, Schneider heard the radio call about the well-being check. *Id.* at p. 544:8-23. Thus, any harm was the result of a mistake not intentional malice or reckless disregard. Finally, for Clyne, her testimony regarding her mindset at the time of entry and the reasons for her actions establishes she did not act out of reckless disregard or intentional malice, but at worst made a mistake with respect to what was required before she could enter the apartment.

### B. Disparity Between Actual or Potential Harm Suffered and the Punitive Damages Award Supports That The Award Was Unreasonable.

Under the second *Gore* guidepost, the Court is instructed to evaluate the disparity between the actual harm and the punitive damages award. The Court has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages, consistently rejecting "the notion that a constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award." *Gore*, 517 U.S. at 582; *State Farm*, 538 U.S. at 424. However, the discrepancy between the two should be part of the Court's evaluation. "[C]ourts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *State Farm*, 538 U.S. at 426. Here, it was not. Plaintiff was awarded $125,800 in compensatory damages, and $425,000 in punitive damages.

Comparing the jury's award of compensatory damages to punitive damages shows that the awards are unreasonably disproportionate. This is especially true given that compensatory damages, by their very nature, already contain a punitive element to compensate for emotional distress related to humiliation or indignation around by the defendant's act. *State Farm*, 538 U.S. at 426 (citing Restatement 2d of Torts § 908, Comment c, p. 466 (1977) ("In many cases in which compensatory damages include an amount for emotional distress [...] there is no clear line of demarcation between

punishment and compensation and a verdict for a specified amount frequently includes elements of both")). Where a punitive award is duplicative of the compensatory award, it had "little to do with the actual harm suffered by the [plaintiffs.]" *Id.* at 427. Thus, the punitives may be found to be unreasonable and disproportionate. *See id.* at 428.

In this case, nearly 80% of the compensatory damages awarded were to compensate and make Plaintiff whole for any emotional distress, mental pain, or indignation he suffered as a result of this incident. *See* Ex. 1 at p. 1036:20-23. It would neither be reasonable nor proportional to utilize punitive damages for the same goal. *See State Farm*, 538 U.S. at 426-28; *see Farfaras v. Citizens Bank and Trust of Chic.*, 433 F.3d 558, 567 (7th Cir. 2006) (noting that the punitive damage award was not improper as it was "not duplicative of the compensatory award."). However, that is exactly what happened here. The jury's second set of questions during deliberation shows that they were focused on Plaintiff's emotional damages, asking whether the criminal case would be part of his "permanent record." Ex. 1 at p. 1028:18-23. This suggests that the jury used the punitive damages award to further compensate Plaintiff for harm the compensatory damages already made him whole. Or, at the very least, the jury improperly speculated as to the potential effect this case would have on Plaintiff's permanent record because no such evidence was before them. *See id.* at p. 1031:12-16. Thus, it appears their award was improperly based on speculation in an attempt to compensate Plaintiff for emotional pain and suffering, resulting in unreasonably disproportionate awards.

### C. The Disproportion in Punitive Damages Awarded Here and Those in Comparable Cases is Indicative of the Award's Excessiveness.

The final guidepost set forth in *Gore* is to examine the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 428 (quoting *Gore*, 517 U.S. at 575). In considering comparable cases, there exists a wide variation in punitive damages awards. For instance, one factor which can be used for comparison is the amount of physical injury experienced by the plaintiff. *See Taliferro v. Augle*, 757 F.2d 157, 158

(7th Cir. 1985) ($25,000 in punitive damages against to police officers for destroying plaintiff's dental plate and knocking out many of his real teeth); *Terrell v. Univ. Park*, No. 92 C 3320, 1994 WL 30960 (N.D. Ill. Feb. 1, 1994) ($5,000 in compensatory damages and $10,000 in punitive damages for excessive force which resulted in no significant injury); *Burks v. Harris*, No. 90 C 0728, 1991 WL 140114 (N.D. Ill. 1991) ($6,500 in punitive damages imposed against defendant police officers for striking the plaintiff below the eye with a police radio); *Grosse v. Van Milligen*, No. 83 C 9334, 1987 WL 16242 (N.D. Ill. 1987) ($75,000 in punitive damages was found to be "monstrously excessive" and reduced to $10,000 where the police officer who grabbed the plaintiff, threw him to the ground, and punched him multiple times); *Lewis v. Downs*, 774 F.2d 711, 712-15 (6th Cir. 1985) ($4,000 against police officers who repeatedly stomped on the plaintiff's head). In comparison here, Plaintiff experienced little if any lasting physical injuries, yet the punitive damages imposed were grossly disproportionate when compared with other cases with more substantial physical injuries.

Another factor is the experienced loss of liberty. Here it was less than a week. When comparing cases where the loss was far more extreme, the unreasonableness of this award is evident. *Compare Patrick v. City of Chic.*, 14 CV 03658, Dkt. 364 (wrongful incarceration for 21 years: individual punitive awards ranged from $10,000 to $20,000); *Fields v. City of Chic.*, 10 C 1168, 2017 WL 3987356, *1 (N.D. Ill. Sept. 11, 2017) (wrongful incarceration on death row for more than 20 years: individual punitive awards were $10,000 and $30,000).

In Defendants' review of cases awarding punitive damages on jury verdict, the closest comparable case factually was *McDowell v. Vill. of Hillside*, 95 L 12542. Ex. 8, Jury Verdict Report. There, the defendant officer was dispatched to the plaintiff's home after a neighbor reported a "peeping tom", allegedly one of the plaintiffs. *Id.* The officer pepper sprayed one of the plaintiffs twice without provocation, pursued two of the plaintiffs into the house without a warrant, and

slammed a screen door against another plaintiff's leg, crushing it. *Id.* Two plaintiffs were then arrested, and one spent three days in jail before posting bond. *Id.*

The jury returned a verdict in favor of the plaintiff: $21,500 in compensatory damages; $6,000 in punitive damages. *Id.* $4,000 in punitive damages was awarded for the plaintiff who was pepper sprayed, chased into the home, and incarcerated. *Id.* $2,000 in punitive damages was awarded to the plaintiff who was chased into the home, arrested, and spent three days in jail. *Id.*

While, as discussed above, ratios have not been adopted to confirm whether an award is unreasonable under guidepost two, where the court is to evaluate and consider comparable cases under guidepost three, mathematical analysis is useful in the effective application of such comparisons. In *McDowell*, the punitive damages were about 28% of the compensatory award. *See id.* Whereas here they represent approximately 338% of the compensatory award. This is highly disproportionate and indicative of jury bias resulting in an improper windfall. *Allahar v. Zahora*, 59 F.3d 693, 697-98 (7th Cir. 1995) (quoting *Ramsey*, 772 F.2d at 1314).

"If the court determines that an award of punitive damages is a windfall it can reverse or adjust the award through JNOV or remittitur." *Grosse*, 1987 WL 16242, at *3. Because the *Gore* factors demonstrably weigh in Defendants favor, Defendants request this Court set aside the punitive damages award against them. The facts and evidence do not warrant such an outrageous award in this case. This verdict was clearly the result of a biased and inflamed jury.

However, in the alternative, Defendants recommend that the percentage in *McDowell* be used as a guide for remittitur, reducing the total amount of punitive damages to no more than $35,000, or approximately 28% of the compensatory award. "Remittitur, a reduction in the damage award, serves as a compromise when a jury award of punitive damages is warranted but the figure is excessive." *Id.* This is much more in line with comparable cases, the evidence presented here, and the precedent set by the Supreme Court.

## <u>CONCLUSION</u>

WHEREFORE, Defendants pray that this Court enter judgment in their favor pursuant to Fed. R. Civ. P. 50 or, in the alternative, order a new trial pursuant to Fed. R. Civ. P. 59 on all counts on which judgment was not entered in favor of Defendants, or to alter/amend the award of punitive damages, and for any other relief the Court deems proper.

Respectfully Submitted,

Whitney N. Hutchinson (6303571)    BORKAN & SCAHILL, LTD.
BORKAN & SCAHILL, LTD.
20 South Clark Street, Suite 1700
Chicago, Illinois 60603            By:    /s/ Whitney N. Hutchinson
(312) 580-1030                            Whitney N. Hutchinson