**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GARY COOPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 3519** |
| | ) | |
| **THE CITY OF CHICAGO,** | ) | |
| **KATHLEEN CLYNE, KEN JA,** | ) | |
| **VASILIOS PAPADOPOULOS,** | ) | |
| **and ROBERT SCHMIDT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

Gary Cooper filed suit alleging that Chicago police officers Kathleen Clyne, Ken

Ja, Kathy Schneider, Vasilios Papadopoulos, and Robert Schmidt unlawfully entered his

apartment without a warrant following a dispute with his landlord over construction

noise.  He claims the officers used physical force, pepper spray, and a Taser against

him, then took him to jail.  Cooper further alleges that the defendants charged him with

criminal damage to property and resisting arrest in a malicious prosecution.  The

damage to property charge was later dismissed, and Cooper was acquitted of the

charge of resisting arrest.

On February 16, 2018, after a trial before a jury, Cooper prevailed against one or

more defendants on all of his claims under 42 U.S.C. § 1983 and Illinois common law

for unlawful entry, false arrest, excessive force, and malicious prosecution.  The jury

awarded Cooper $100,000 for physical, mental, and emotional pain and suffering, $800

for medical care and supplies, and $25,000 for loss of liberty, for a total of $125,800 in compensatory damages. The jury awarded Cooper punitive damages of $100,000 against Clyne, $50,000 against Ja, $100,000 against Schneider, $75,000 against Papadopoulos, and $100,000 against Schmidt, for a total of $425,000 in punitive damages.

On March 20, 2018, the defendants submitted a combined motion for judgment as a matter of law under Rule 50 or for a new trial or to alter the judgment under Rule 59. Cooper has filed a bill of costs and has moved for attorney's fees and a writ of execution to enforce the judgment.

## Discussion

### I.    Rule 50 motion

Under Rule 50, a court may "enter judgment against a party who has been fully heard on an issue during a jury trial if 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(a)). The defendants contend that Clyne, Papadopoulos, and Schneider are entitled to qualified immunity on the unlawful entry claim. They contend that Clyne was responding to exigent circumstances and that Papadopoulos and Schneider were entitled to rely on Clyne's statements under the collective knowledge doctrine.

The Court first considers Clyne's eligibility for qualified immunity. The doctrine of qualified immunity provides a defense in a section 1983 suit for damages where, among other things, the right the officer is claimed to have violated was not a "clearly established constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). At

trial, the defendants argued that there were exigent circumstances justifying Clyne's entry into Cooper's apartment. The jury rejected that argument, finding that the entry violated Cooper's constitutional rights. In their motion for judgment, defendants contend that Clyne did not violate a "clearly established . . . right of which a reasonable person would have known" when she entered Cooper's apartment. *Pearson*, 555 U.S.at 231.

In arguing for qualified immunity, Clyne's brief is long on law and short on facts: she cites to several cases but few facts that indicate that these cases are relevant precedent for the circumstances that confronted her when she entered Cooper's apartment. The Court reads the defendants' brief as contending that Clyne is entitled to qualified immunity because she reasonably, if erroneously, believed her conduct fell within either the exigent circumstances or emergency aid exceptions to the Fourth Amendment's warrant requirement.[1] "[A] warrantless entry is analyzed as an 'emergency' if purportedly made 'incident to the service and protective functions of the police' and as an 'exigent circumstance' if allegedly executed in a "law enforcement" capacity[.]'" *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994).

First, the defendants contend that Clyne reasonably believed she encountered exigent circumstances when she heard pounding from Cooper's apartment while responding to a call regarding a noise dispute between Cooper and the landlord. The Seventh Circuit has held that "at a minimum, exigent circumstances do not exist when the underlying offense is minor, typically a misdemeanor." *Hawkins v. Mitchell*, 756 F.3d 983, 992 (7th Cir. 2014) (quoting *Reardon v. Wroan*, 811 F.2d 1025, 1028 (7th Cir.

---

[1] The defendants' primary argument focuses on exigent circumstances, but they cite several cases interpreting the emergency aid doctrine. The Court considers both exceptions to ensure it completely addresses the defendants' arguments.

1987)).  The exigent circumstances cases that Clyne cites are not analogous, as all involved conduct indicating far more severe offenses.  *Michigan v. Fisher*, 558 U.S. 45, 46 (2009) (officers entered house after seeing broken glass and bloody clothing outside the home); *Brigham City v. Stuart*, 547 U.S. 398, 406 (2006) (officers entered house after hearing shouting, witnessing juveniles drinking alcohol, and seeing one individual strike another, drawing blood); *Hopkins v. City of Sierra Vista*, 931 F.2d 524, 527-29 (9th Cir. 1991) (officer entered a house after receiving a tip that an individual who had previously engaged in domestic violence was striking his wife and, upon approach to the house, heard loud noises consistent with an argument); *Anderson v. City of W. Bend Police Dep't*, 774 F. Supp. 2d 925, 932-33 (E.D. Wis. 2011) (officers entered an apartment after receiving a tip that the caller heard a domestic dispute in which "things bang[ed] around" and a female voice said "help me, help me").

Here, as perceived by a reasonable officer, the underlying offense was, at worst, criminal damage to property, which in Illinois is a misdemeanor.  *See* 720 ILCS 5/21-1. The defendants have failed to present any evidence that the circumstances surrounding the pounding sound—a noise dispute between a landlord and a tenant—could support an officer's reasonable belief that the underlying offense was anything more serious. The Court concludes Clyne cannot invoke qualified immunity based on exigent circumstances, as it was clearly established that criminal damage to property is not the sort of conduct that gives rise to exigent circumstances.  *Hawkins*, 756 F.3d at 992.

For the same reason, Clyne's second ground for qualified immunity—emergency aid—is likewise unsuccessful.  Under the emergency aid exception to the warrant requirement, an officer may enter a private home without a warrant to render

4

emergency assistance to a seriously injured resident or to prevent such injury. *Brigham City*, 547 U.S. at 403-04. The question before the Court is whether a reasonable officer could have thought that the emergency aid was necessary upon hearing the sounds at issue in this case, namely, a tenant banging upon the ceiling of his apartment in the midst of a noise dispute with his landlord over construction. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 562 (7th Cir. 2014) ("the emergency exception requires an analysis of the *circumstances* to determine whether an emergency requiring immediate action existed") (quoting *Hunsberger v. Wood*, 570 F.3d 546, 554 (4th Cir. 2009)). No reasonable officer could conclude that the sound was the result of violence in the apartment when the overwhelmingly obvious inference is that the tenant is banging on the ceiling to stop the landlord from engaging in further construction. *See Kemp v. Liebel*, 877 F.3d 346, 351 (7th Cir. 2017) ("In the absence of controlling or persuasive authority, plaintiffs can demonstrate clearly established law by providing that the defendant's conduct was so egregious and unreasonable that no reasonable official could have thought he was acting lawfully.") (internal punctuation omitted).[2] In sum, the Court concludes that Clyne is not entitled to judgment as a matter of law on the basis of qualified immunity.

Likewise, Papadopoulos and Schneider are also not entitled to qualified immunity. The defendants contend that the officers may rely on the collective knowledge doctrine. Under this doctrine, one officer may arrest an individual based on the information provided by a second officer, if the second officer has knowledge

---

[2] To be clear, there are certainly situations when similar noise *could* justify a reasonable officer in attempting to offer emergency aid, but the particular circumstances of this case foreclose that conclusion.

5

sufficient to justify the action. *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010). It is "separate from, but related to" the qualified immunity analysis. *Crawford v. City of Chicago*, No. 12 C 5289, 2014 WL 1661720, at *6 (N.D. Ill. Apr. 25, 2014). The jury has already found that there were no exigent circumstances, so the collective knowledge doctrine is not directly applicable. Rather, the issue for purposes of qualified immunity is whether it was objectively reasonable for the officers to act in reliance on the information Clyne provided. *See Holmes v. City of Chicago*, 63 F. Supp. 3d 806, 816-17 (N.D. Ill. Aug. 6, 2014).

It was not. First of all, the evidence did not show that Clyne was in communication with the other officers before they reached Cooper's door, nor did it show what information, if any, was actually communicated. *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010) (noting that the collective knowledge doctrine requires the officer invoking it must actually receive, and act upon, information from another officer). Second, even if the other officers were in communication with Clyne, the information available to her would preclude qualified immunity for the other officers, as it was clearly established that Clyne's conduct would have violated Cooper's rights. In short, Papadopoulos and Schneider are not entitled to qualified immunity. For these reasons, the Court denies the defendants' motion for judgment as a matter of law.

## II.    Rule 59 motion

The defendants have also moved under Rule 59, asking the Court to order a new trial or to alter the punitive damages award. The Court begins with the request for a new trial.

### A.    New trial

6

To obtain a new trial, the defendants contend that two errors rendered the trial "fundamentally unfair." *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313 (7th Cir. 2011). First, the defendants argue the Court erroneously excluded relevant evidence. Second, they contend the jury reached inconsistent verdicts.

### 1. Evidentiary error

First, the defendants contend that two erroneous evidentiary rulings warrant a new trial. To determine whether an evidentiary ruling warrants a new trial, the Court determines whether there was an error that had a "substantial and injurious effect or influence on the determination of a jury and the result is inconsistent with substantial justice." *Lewis v. Chi. Police Dep't*, 590 F.3d 427, 440 (7th Cir. 2009). A new trial is not warranted if the error was harmless, that is, if the result of the trial would have been the same regardless of the error. *Id.* In this case, because the Court concludes that its rulings were not erroneous, it need not proceed to the harmlessness inquiry.

The defendants contend the Court erred in excluding the testimony of Charles Lamberty. Lamberty was the watch commander on the evening that Cooper was arrested, and he purportedly added a comment to Cooper's arrest report that stated "subject refuses to sign recognizance bond." D.E. 157, Pl.'s Ex. A at 6 (Arrest Rep.). This statement, the defendants contend, would be relevant to the jury's analysis of damages, because it indicates that Cooper spent more time in jail after he refused to accept a recognizance bond, which would have permitted him to leave jail earlier.

During discovery, Cooper's counsel elected not to depose Lamberty, after defense counsel represented that Lamberty had no recollection of the events and

provided to plaintiff's counsel an affidavit in which Lamberty stated, "I did not author any reports relating to the arrest of Gary Cooper on March 22, 2014" and, more importantly, "I have no independent recollection of these events, or of any interactions or conversation I may have had with Gary Cooper or any police personnel relating to this incident." *Id.*, Pl.'s Ex. C at ¶¶ 4-5 (Lamberty Aff.). Just before trial, however, the defendants announced their intention to call Lamberty to testify about the arrest report. After hearing argument at the final pretrial conference, the Court excluded Lamberty as a witness on fairness grounds, given the defendants' previous representations. *See id.*, Pl.'s Ex. D at 42 (Feb. 8, 2018 Hr'g Tr.).[3]

The defendants contend that this decision was erroneous. They argue that, even though they said Lamberty had no recollection of the events, they never stated that they did not intend to call Lamberty, so he had been disclosed as a witness. But an *adequate* disclosure requires more than that, particularly as defendants (and Lamberty himself) had represented, during discovery, that Lamberty had no recollection of what Cooper had said. It was not until just before trial, after discovery had long been closed, that defendants did an about-face and proposed to call him to testify about Cooper's statements. This was not a timely disclosure of defendants'—or Lamberty's—change of position.

The Seventh Circuit has established a four-factor test to determine whether a

---

[3] Though the defendants identified Lamberty in their Rule 26(a)(1) disclosures, the affidavit amounted to a supplement to those disclosures, to the effect that he had no recollection of the relevant events. "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

litigant's failure to comply with the requirement to disclose witnesses under Rule 26(a) and the requirement to provide "additional corrective information" under Rule 26(e). *See David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The Court considers this to be a useful aid for considering the defendants' conduct in the present case.

First, Cooper suffered both surprise and prejudice from the defendants' failure to fully disclose how they intended to use Lamberty. The defendants proposed to use him to provide testimony that they (and he) previously stated he could not recall. They contend, despite this, that Cooper did not suffer prejudice; they argue that he would not have deposed Lamberty, as he did not take the depositions of other officers. This contention directly contradicts what defense counsel said to the Court during the final pretrial conference when Lamberty was discussed: when the Court directly asked defense counsel whether they had "any reason to contradict what [plaintiff's counsel] just said. In other words, based on this, she decided not to take the deposition," defendants' counsel unequivocally responded, "No." Defs.' Ex. 2 at 42:4-7. It is rather unseemly, at best, for defense counsel to fail to acknowledge in their post-trial motion that their argument contradicts their prior express representation to the Court. In any event, the Court declines to use against Cooper his efficient use of the discovery process, that is, the fact that he did not depose every conceivable person with knowledge of matters that might touch upon the case. It is reasonable to believe that if defendants had disclosed that Lamberty would testify about statements made by Cooper himself—a relatively significant topic—Cooper's counsel would have taken his deposition. In short, the defendants' failure to accurately share Lamberty's state of knowledge prejudiced the plaintiff.

9

Second, Cooper had limited capacity to cure the prejudice from this surprise, as it would necessitate changing trial strategy on the fly. Third, Lamberty's testimony would have disrupted the trial for the same reason, as it would force Cooper into quick changes of trial strategy. Last, the defendants' conduct suggests "bad faith" and "willfulness" in withholding the actual state of Lamberty's claimed knowledge until the eve of trial. *Id. See also Smith v. Nurse*, No. 14 C 5514, 2016 WL 4539698, at *11 (N.D. Ill. Aug. 31, 2016) (noting that the Federal Rules of Civil Procedure discourage "trial by ambush"). The Court concludes that it did not err in excluding Lamberty's testimony.

The defendants present additional arguments against Lamberty's exclusion, none of which is convincing. First, the defendants contend that Lamberty was only being offered for impeachment purposes, so they were not required to disclose him under Rule 26. But "some evidence serves both substantive and impeachment functions and thus should not be treated as 'solely' impeachment evidence." *Olivarez v. GEO Grp., Inc.*, 844 F.3d 200, 204 (5th Cir. 2016) (citing *Wilson v. AM Gen. Corp.*, 167 F.3d 1114, 1122 (7th Cir. 1999)). This admonition is clearly applicable here. It is beyond question that Lamberty's testimony was substantive: defendants wanted to offer it to undercut the claim for damages, by showing that Cooper's detention was effectively his own doing. Other courts have cautioned against "[a] too expansive reading of the impeachment exception," which "could cause a resurgence" of the "evils" that Rule 26 was intended to end, including "trial-by-ambush." *Id. See also Wilson*, 167 F.3d at 1122 (affirming district court's decision to exclude a party's undisclosed impeachment witnesses whose testimony would have substantive applications).

10

Defendants also argue that they "were prevented from entering the portion of the police report which reflects that Lamberty offered the bond and Plaintiff refused."  Defs.' Am. Mot. for J. as a Matter of Law & Mot. for New Trial at 3.  This is, to be blunt, a misrepresentation of the record.  Defendants *never* actually offered the arrest report. Indeed, the record reference they cite in their motion to support this contention, *see id.* (citing Exhibit 2 to their motion, page 10 of the transcript of the final pretrial conference); *see also id.* at 6 (citing the same transcript page) concerns a motion *in limine* regarding *completely different* police reports, specifically, tactical response reports, or "TRRs," that Cooper had moved to exclude via his motion *in limine* 11.[4]  In short, defendants cite nothing to support their contention that they offered the arrest report or that the Court preemptively excluded it.  This argument has been forfeited.  *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) (holding that a party that fails to argue a point has forfeited it).

In their motion, defendants engage in an extended discussion regarding the admissibility of the arrest report under various exceptions to the hearsay rule.  Defs.' Am. Mot. for J. as a Matter of Law & Mot. for New Trial at 6-8.  This argument gets them nowhere given their failure to offer the arrest report on this (or, for that matter, any

---

[44] Defendants misrepresent the record a second time when they say that the Court excluded the arrest report on the ground that it was inadmissible hearsay.  As indicated in the text, the reports excluded at the hearing cited by defendants were the TRRs.  But the Court did not even exclude *those* reports on hearsay grounds.  Though the Court made a comment regarding whether the reports were admissible as business records or public records, *see* Defs.' Ex. 2 (pretrial conf. tr. at 10:9-15), the selfsame transcript makes it absolutely clear that the Court excluded the TRRs "under [Rule] 403" on the ground that they were cumulative.  The bottom line, however, is that defendants cite nowhere in the record where they offered, and the Court excluded, the arrest report.

other) basis; they have forfeited the point. But even if they had offered the report, it was not self-authenticating; defendants would have had to lay a foundation for its admission. (They cite no authority supporting any contention that a police report containing a statement by a party is admissible by itself without authentication and foundation. A contrary holding would come as a great surprise to prosecutors and criminal defense lawyers; law enforcement reports memorializing purported statements by parties are *never* admitted into evidence without foundational testimony.) Defendants identify no one other than Lamberty who could have provided a foundation for the admission of the report. But their (and Lamberty's) representation during discovery that he had no recollection of the events eliminates him as a viable foundational witness.

The defendants contend that they were above board in their dealings with Cooper, as they told Cooper's counsel that the no-memory affidavit that Lamberty submitted did not mean that they would forgo calling Lamberty at trial. An e-mail from Cooper's counsel sums up the Court's response well: "These affidavits are supposed to be a compromise between the parties to reduce litigation, not a waiver of our right to find out what witnesses that you have disclosed know about this case prior to trial." D.E. 157, Pl.'s Ex. B at 10 (Jan. 16, 2017 Turkcan e-mail). The fact that the defendants essentially crossed their fingers while telling Cooper's counsel that Lamberty did not recall anything did not entitle them to spring a surprise on Cooper on the eve of trial.

The defendants also argue that a new trial is warranted because the Court wrongly relied on Rule 403 to exclude evidence that Cooper presented himself as a so-called "sovereign citizen" during his criminal trial. D.E. 153, Defs.' Ex. 2 at 10 (Feb. 8, 2018 Hr'g Tr.). In an April 2014 proceeding in the misdemeanor case, Cooper asserted

he was "executor director [sic] and sole shareholder" of his own being and that he "deserves his rights at all times under Uniform Commercial Code 1-308." D.E. 157, Pl.'s Ex. E at 2-3 (Apr. 3, 2014 Hr'g Tr.).

Under Federal Rule of Evidence 403, the Court may exclude evidence whose probative value is "substantially outweighed" by a danger of "unfair prejudice." Fed. R. Evid. 403. The defendants propose two ways by which this evidence has probative value. First, if Cooper actually believes he is a sovereign citizen, the defendants argue, then that is a fact showing that he had motive to resist the police during his arrest. The defendant urges the Court to rely on *United States v. Abel*, 469 U.S. 45 (1984), a Supreme Court case in which a witness's gang membership was admissible because it was relevant to show the witness's bias against the defendant, who defected from the gang. *Id.* at 48. *See also United States v. Bell*, 585 F. App'x 552, 553 (9th Cir. 2014) (holding that a defendant's knowledge of the sovereign citizen movement was relevant, as it showed familiarity with the same sovereign citizen concepts that underpinned her husband's campaign to defraud the U.S. Treasury).

The Court concludes that *United States v. Irvin*, 87 F.3d 860 (7th Cir. 1996), is better precedent here. In that case, the Seventh Circuit found that gang membership, disconnected from any material fact or impeachment issue, meant that the evidence had "minimal probative value." *Id.* at 865-66. Likewise, Cooper's purported sovereign citizen beliefs are only documented by a poorly advised citation to the Uniform Commercial Code. Nothing suggests he believed the government or its agents should be repelled or resisted by force. In short, defendants have failed to offer anything to suggest their proposed inference is reasonable. Thus, as in *Irvin*, Cooper's purported

13

sovereign citizen status is unconnected from a material fact or impeachment issue. The evidence, as presented under this theory, has little probative value.

Defendants also contend that if Cooper was misrepresenting his membership in the sovereign citizen movement as a legal defense, this is impeachment evidence showing he lied in a judicial proceeding. Cooper was a *pro se* criminal defendant when he attempted to assert his rights under the Uniform Criminal Code. A *pro se* defendant's mistaken attempt to rely on an outlandish legal theory may be probative of misguidedness, a self-induced delusion, or a lack of legal acumen. But defendants have not shown that it has any material bearing on his truthfulness, especially when Cooper's statements in the misdemeanor case weren't demonstrably false:

> [COOPER]: I'm an individual who deserves his rights at all time under Uniform Commercial Code 1-308.
>
> THE COURT: I'm familiar with the UCC. And you are a human being who goes by the name of Gary Cooper; correct?
>
> [COOPER]: Of a name similar. And I'm executor director and sole shareholder of the being.

D.E. 153, Defs.' Ex. 7 at 228 (Dec. 29, 2016 Hr'g Tr. Excerpt). Cooper's attempt to use a misguided legal theory is nothing like evidence indicating that a defendant used a fake name, which may be admissible to show character for untruthfulness. *Thompson v. City of Chicago*, 722 F.3d 963, 978 (7th Cir. 2013).

In sum, evidence regarding Cooper's sovereign citizen defense has minimal probative value on either theory the defendants have proposed. And in either situation, the probative value of the evidence is easily and significantly outweighed by its risk of unfair prejudice. Although the sovereign citizen movement differs from criminal gangs in many ways, both share a poor public reputation, and the Seventh Circuit has "long

14

recognized" that evidence of gang membership gives rise to a "substantial risk of unfair prejudice." *United States v. Dillard*, 884 F.3d 758, 764 (7th Cir. 2018). *See also United States v. Ulloa*, 511 F. App'x 105, 106 n.1 (2d Cir. 2013) (noting that the FBI has described sovereign citizens as a "domestic terrorist group"). The Court properly excluded this evidence under Rule 403.

In sum, the Court declines to grant the defendants a new trial based on the evidentiary rulings they cite.

### 2. Inconsistent verdicts

Next, the defendants argue that the jury reached inconsistent verdicts, requiring a new trial. *See Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 677 (7th Cir. 1985). "If possible, [a] court must reconcile apparently inconsistent verdicts, rather than overturn them." *Deloughery v. City of Chicago*, 422 F.3d 611, 617 (7th Cir. 2005). Verdicts are inconsistent when "no rational jury could have brought back the verdicts that were returned." *Id.* (internal quotation marks omitted). The Court concludes that it can easily reconcile the purportedly "inconsistent" verdicts.[5]

The defendants contend that the jury's first inconsistent determination was that Ja and Schmidt were not liable for false arrest, but the other officers were liable. A false arrest claim requires a plaintiff to show (1) an arrest (2) made without probable cause. *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016). The defendants contend that the jury's finding that Ja and Schmidt were not liable must entail a finding that they

---

[5] The Court relies on the very thin record provided by the defendants to make this analysis. Unsupported arguments are generally waived. *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010). The record and case law provide enough information for the Court to conclude that the verdicts can be fairly reconciled.

had probable cause to arrest Cooper, and it would be inconsistent for the jury to find that Ja and Schmidt had probable cause to arrest when the other defendants did not. But the jury could have found in favor of Ja and Schmidt on the ground that they were not involved in the arrest, whereas the other officers were. Thus the jury did not necessarily reach an inconsistent outcome on probable cause.

Next, the defendants argue that the jury's verdict finding Papadopoulos and Schmidt not liable for excessive force but the other officers liable on that claim. The defendants contend these verdicts imply that the jury found that Cooper was resisting arrest, which if so would preclude liability for any of the officers, not just Papadopoulos and Schmidt. But again, the jury could have concluded that Papadopoulos and Schmidt did not use force at all and were not liable for that reason, not become of some justification for their conduct. Again, there is no apparent inconsistency.

Finally, the defendants contend that the punitive damages were inconsistently awarded. The jury awarded Cooper $100,000 in punitive damages against Schmidt, who was found liable for malicious prosecution, as well as Clyne and Schneider, who were found liable for unlawful entry, false arrest, excessive force, and malicious prosecution. Defendants argue that "the jury decided to punish Schmidt at the same level as Clyne and Schneider, despite substantially distinct findings of liability." Defs.' Am. Mot. for J. as a Matter of Law & Mot. for New Trial at 13.

The defendants cannot prevail on this argument, because it rests on the mistaken premise that it is inconsistent for punitive damages for different defendants to be the same even if they are found liable on different bases. That is not necessarily so. Punitive damages "should be proportional to the wrongfulness of the defendant's

actions." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 676 (7th Cir. 2003). In this case, for example, the jury reasonably could have found that Schmidt, who appears to have been the supervising officer, was more blameworthy than the other officers, even if he was liable on fewer claims overall. *See Lally v. City of Chicago*, No. 10 C 5011, 2013 WL 1984422, at *7 (N.D. Ill. May 13, 2013) (describing how a jury assigning damages may view a supervising sergeant involved in misconduct as more culpable than other officers). The Court does not find the jury's punitive damage awards inconsistent.

For these reasons, the Court denies the defendants' Rule 59(a) motion.

## B.    Alter or amend the judgment

The defendants have also moved to alter or amend the award of punitive damages under Rule 59(e). The defendants contend that the award of punitive damages was not based on an "application of law" but a "decisionmaker's caprice" in violation of the Due Process Clause. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 587 (1996). To determine whether punitive damages are unconstitutionally excessive, a court considers (1) the reprehensibility of the defendants' misconduct, (2) the disparity between harm and damages, and (3) the difference between the damages at issue and other penalties applied for similar conduct. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

The first factor, reprehensibility, looks to "[t]he flagrancy of the misconduct," which is "the primary consideration in determining the amount of punitive damages." *Gore*, 517 U.S. at 575 n.23 (citation omitted). The defendants contend that their conduct was not flagrant, because this was an isolated incident and each officer entered

17

Cooper's residence in the genuine, if incorrect, belief that there were exigent circumstances. Cooper retorts that the officers' testimony indicated that this was not the first time the officers engaged in this type of behavior. He further notes that at the base of this suit is the fact that the defendants entered his home unannounced and violently, causing "confusion and chaos." Pl.'s Resp. in Opp. to Defs.' Post-Trial Mots. at 21. Cooper has the better of the argument, as reasonable jurors could find the defendants entered his home without a warrant or any justification excusing one, used excessive force, and trumped up false charges against him, which is "inherently reprehensible." *Torres v. City of Chicago*, No. 12 C 7844, 2016 WL 4158914, at *25 (N.D. Ill. Aug. 5, 2016). Furthermore, the jury reasonably could have concluded that the officers lied repeatedly under oath throughout this litigation. *See Gore*, 517 U.S. at 576 (describing "trickery" and "deceit" as reprehensible); *Lust v. Sealy, Inc.*, 383 F.3d 580, 591 (7th Cir. 2004) (considering conduct that occurred after the injury giving rise to punitive damages when assessing reprehensibility).

The defendants contend that their conduct was not all that reprehensible. As in *McKinley v. Trattles*, 732 F.2d 1320 (7th Cir. 1984), they argue that the jury imposed punitive damages based on "the seriousness of the allegations," not on what conduct was actually proved at trial. *Id.* at 1328. But, unlike in *McKinley*, where the jury did not sustain many of the plaintiff's allegations, here the jury did just that: it found for Cooper on every count against one or more of the defendants.

The second factor is whether there is a disparity between the harm or potential harm the plaintiff suffered and the punitive damages award. *State Farm*, 538 U.S. at 418. Although the Supreme Court has not offered a fixed ratio to compare

18

compensatory and punitive damages, it has noted that "few awards exceeding a single-digit ratio . . . will satisfy due process." *State Farm*, 538 U.S. at 424-25; *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 839 (7th Cir. 2013). The jury awarded Cooper $425,000 in punitive damages and $125,800 in compensatory damages, for a ratio of 3.4:1, which is "well within the range covered by precedent." *Gracia v. Sigmatron Int'l, Inc.*, 102 F. Supp. 3d 983, 993 (N.D. Ill. 2015) (collecting cases).

The defendants contend that the ratio is actually higher, because much of the compensatory damages were punitive in character and so were duplicative of the punitive damages. *See State Farm*, 538 U.S. at 426 (noting that "there is no clear line of demarcation between punishment and compensation" in damages involving emotional injury) (citing Restatement (Second) of Torts § 908 cmt. c (1977)). Not so. The compensatory damages were just that, compensatory; there is no basis to believe that the jury disregarded the Court's instructions in this regard. In addition, punitive damages do not just provide individual claimants with retribution for the defendant's misconduct; they "further a [s]tate's legitimate interest in . . . deterring its repetition." *Gore*, 517 U.S. at 568. The need for deterrence is particularly acute here, as "police brutality is a longstanding problem with which many cities are still coming to grips." *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008) (affirming a ratio of 9:1 in an excessive force case). *See also, e.g., Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 567 (7th Cir. 2006) (noting that the punitive damages award was "not duplicative," as it aided society in "deterrence of similar future conduct"); *Torres*, 2016 WL 4158914, at *24 ("the jury was entitled to award punitive damages . . . to punish Pena *and* deter similar unprofessional conduct by Chicago police officers.") (emphasis added).

19

Finally, the Court must compare the punitive damages awarded to Cooper with "the civil penalties authorized or imposed in comparable cases." *State Farm*, 538 U.S. at 418. The inquiry is similar to that used in the analysis of potentially excessive compensatory damages, which asks "whether the award is roughly comparable to awards made in similar cases." *David*, 324 F.3d at 864. As the undersigned judge has previously written in the context of compensatory damages, any attempt to compare damages across different cases is "inherently problematic." *Deloughery v. City of Chicago*, No. 02 C 2722, 2004 WL 1125897, at *5 (N.D. Ill. May 20, 2004); *Zurba v. United States*, 247 F. Supp. 2d 951, 961-62 (N.D. Ill. 2001). Several difficulties that arise in this case illustrate the point. First, the jury awarded punitive damages against multiple individual defendants. In analyzing comparable cases, should the Court consider the individual awards, which range between $50,000 and $100,000, or the total punitive damages, which amount to $425,000? The Seventh Circuit has not clearly addressed this question. In *Cooper v. Casey*, 97 F.3d 914 (7th Cir. 1996), a case involving punitive damages awarded against seven individual defendants, the Seventh Circuit considered the individual awards, rather than the net award. *Id.* at 920 ("The highest award of punitive damages against any one of the seven defendants was only $22,500."). Here, the Court will conduct the analysis considering both the total punitive damages and the amount levied against individual officers, mindful of the fact that comparison cases involving only one defendant will likely have lower total awards than those with multiple defendants.

Any comparative analysis is also made more difficult by the "fact-specific nature of [civil rights] claims," which "results in a dearth of apples-to-apples comparisons."

*Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 883 (E.D. Wis. 2015). The misconduct in this case includes multiple events: the officers' unlawful entry into Cooper's home, their use of excessive force, his incarceration, and the wrongful prosecution he had to defend against. Unsurprisingly, it is difficult to find cases that match these facts.[6]

With these considerations in mind, the Court proceeds to address the cases that each side has offered. In support of their position, the defendants offer many cases in which—unsurprisingly—the underlying plaintiff was awarded much less in punitive damages. But these cases all involve plaintiffs with injuries quite different from those in this case. For instance, the defendants note that a jury awarded $5,000 in compensatory damages and $10,000 in punitive damages to a plaintiff who was handcuffed, slapped in the back of the head, and pushed against a police cruiser. *Terrell v. Village of University Park*, No. C 92 C 3320, 1994 WL 30960, at *1-2 (N.D. Ill. Feb. 1, 1994). This decision—which is representative of the cases cited by defendants—does not help their cause here. The damages awarded to the plaintiff in *Terrell* are about as relevant here as the price a Ford F-150 can command would be in a negotiation over a Toyota Prius.

Several cases, however, indicate that the individual punitive damages at issue here—ranging between $50,000 and $100,000 per defendant—are consistent with cases involving generally comparable injuries. *See Hendrickson v. Cooper*, 589 F.3d 887, 891 (7th Cir. 2009) (affirming $125,000 in punitive damages against a prison guard

---

[6] On a more general level, caution is called for before upsetting a jury verdict based on comparative analysis with other cases, given "the Founders' vision" of "submitting civil disputes to citizen juries," which requires courts to "be willing to accept variations in how juries will assess [ ] damages in different cases." *Deloughery*, 2004 WL 1125897, at *5.

for slamming the plaintiff into a wall and pressing his knee into the plaintiff's back); *Kunz*, 538 F.3d at 679 (affirming $90,000 in punitive damages against an officer who repeatedly punched the plaintiff during an interrogation to force a confession); *Degorski v. Wilson*, No. 04 C 3367, 2014 WL 3511220, at *4 (N.D. Ill. July 16, 2014) (remitting punitive damages to $150,000 in punitive damages against a prison guard who subjected the plaintiff to an unprovoked attack).

Though the punitive damages awarded on a per-defendant basis may be similar to other cases, the total amount of punitive damages is, of course, a good deal higher. But Cooper suffered injuries at the hands of numerous officers, each of whom is subject to consideration of the goal of deterrence and punishment. And it stands to reason that the total amount of punitive damages will be higher when a plaintiff is victimized at the hands of multiple defendants than when a plaintiff is injured by one defendant. The Court concludes that punitive damages, ranging between $50,000 and $100,000 per defendant and totaling $425,000, are not out of step with awards in other cases involving comparable facts.

In sum, the defendants' conduct was reprehensible, the ratio of punitive to compensatory damages is permissible, and the amount of punitive damages awarded is consistent with other decisions involving comparable conduct. Under the *Gore* factors, the punitive damages awarded in this case are not unconstitutionally excessive.

The defendants also argue, separate from the *Gore* factors, that a juror who asked a couple of argumentative questions during the trial may have become

foreperson—and conclude this shows that the jury acted capriciously.[7]  First, it is not clear this is even a colorable basis to overturn an award of punitive damages.  Second, even if it is, defendants suggestion of a runaway foreperson leading the jury astray has no support in the record.  Defendants cite a single juror question that the Court said at sidebar was "a little on the argumentative side," *see* Defs.' Am. Mot. for J. as a Matter of Law & Mot. for New Trial at 3.  Even that question was not truly argumentative; it simply asked how a particular scenario suggested by officer Ja's testimony was possible.  Defense counsel take inappropriate liberties with the record, however, by going on to state that "[t]he juror who submitted this question, continued to submit similarly argumentative questions throughout the trial." *Id.*  That is not so, and it is revealing that defendants cite *nothing* in the record to support this, even though the Court recited on the record at sidebar each and every question proposed by jurors.  The truth is that there was no biased juror (defendants never sought or suggested removing or even admonishing this or any other juror), and no support for defendants' contention that this supports a finding of "decisionmaker's caprice." *Id.*  Finally, the foregoing analysis of the *Gore* factors demonstrates that the defendants were not blindsided by these damages:  the damages were reasonably keyed to the reprehensibility of the conduct, in proportion to the amount of compensatory damages, and aligned with those levied in similar cases.  *Gore*, 517 U.S. at 574-75.  This analysis under *Gore* forecloses the possibility that the punitive damages are explicable solely as the product of a single juror's caprice.

---

[7] The Court, as it has done for at least the last ten years in civil trials, permitted jurors to submit questions in writing at the end of each witness's testimony and then addressed the questions with counsel at sidebar before posing any of them.

For these reasons, the Court therefore denies the defendants' Rule 59 motion.

## III. Costs and attorney's fees

Having concluded that the defendants are not entitled to a new trial or judgment as a matter of law, the Court turns to the three remaining motions: Cooper's bill of costs, motion for attorney's fees, and motion for a writ of execution.

### A. Bill of costs

Under Rule 54(d), the prevailing party is entitled to costs. Fed. R. Civ. P. 54(d). Cooper has requested $9,048.65 in costs. To determine whether a cost is chargeable (or taxable, in bill-of-costs parlance) to the losing party, the Court asks two questions: "(1) whether the cost imposed on the losing party is recoverable and (2) if so, whether the amount assessed for that item was reasonable." *Majeske v. City of Chicago*, 218 F.3d 816, 824 (7th Cir. 2000). Under 28 U.S.C. § 1920, the following items are taxable: "(1) Fees of the clerk and marshal; (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case; (5) Docket fees . . . ; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services . . . ." *Id.* "There is a strong presumption favoring the award of costs to the prevailing party." *Allen v. City of Chicago*, No. 10 C 3183, 2016 WL 1070828, at *2 (N.D. Ill. Mar. 16, 2016) (citing *Mother & Father v. Cassidy*, 338 F.3d 704, 708 (7th Cir. 2003)).

### 1. Transcripts

The defendants contend that Cooper is not entitled to the costs associated with

several depositions obtained in this case.  First, the defendants contend that the appearance fees and per-page costs charged by Cooper's court reporter exceeded the rates provided by Local Rule 54.1.  Cooper concedes this point; the Court therefore reduces the appearance rates for the Maderak, Losacco, Wagner, Yee, Cain, and Post depositions to $110 per deposition.  Likewise, the Court reduces the per-page rates of these transcripts to $0.90, as the private court reporter originally charged more than the Judicial Conference-approved rate for a transcript "copy," which the amount for which recovery is permitted.  Second, the defendants contend that Cooper cannot recover the $25 cost of shipping appended to two deposition transcripts.  The "costs associated with delivering, shipping, or handling transcripts are typically non-recoverable ordinary business expenses." *Intercont'l Great Brands LLC v. Kellogg N. Am. Co.*, No. 13 C 321, 2016 WL 316865, at *3 (N.D. Ill. Jan. 26, 2016) (Kennelly, J.).  The Court declines to tax the defendants these costs.

Third, the defendants contend that Cooper unreasonably seeks the costs of obtaining from the court reporters copies of exhibits used during the depositions.  The defendants argue that Cooper merely requested these exhibits for the convenience of plaintiff's counsel, as the defense made the exhibits available at the deposition and through discovery.  But Cooper argues that plaintiff's counsel did not have access to the marked version of the exhibits, which could be—and ultimately, were—used at trial. The Court concludes that these costs were reasonable.  Fourth, the defendants assert that Cooper should not be able to obtain "condensation" costs charged by the defendants' court reporter.  A condensed copy of a transcript is nothing more than another copy for the convenience of counsel.  The Court declines to tax this cost.

Fifth, the defendants argue that Cooper should not be able to recover the costs of the Losacco, Wagner, Yee, and Cain deposition transcripts. Defendants argue that Cooper voluntarily dismissed each party as a defendant after taking the deposition, so there was no reason for Cooper to obtain their transcripts once they were dismissed. But Cooper contends that each party was still likely to be called as a witness at trial. The question is whether the costs that Cooper incurred were reasonably necessary at the time, "without regard to intervening developments that render the deposition unneeded for further use." *Cassidy*, 338 F.3d at 712. The Court's review of the final pre-trial order confirms these were all potential witnesses; these deposition transcripts were a reasonable cost to prepare for trial.

Last, the defendants contend that it was unreasonable for Cooper to obtain a video of his own deposition. They argue that Cooper knew he would be present at his own trial and thus there was no need for a copy of the video. The Court agrees with Cooper that the video was a necessary element of trial preparation, as the defendants could reasonably be expected to use it for impeachment. A party would be "ill-advised" not to obtain a copy of a video deposition if it "know[s] that its opponent possessed video tapes" of the same. *Top Tobacco, L.P. v. N. Atl. Operating Co.*, No. 06 C 950, 2007 WL 1149220, at *7 (N.D. Ill. Apr. 17, 2007) (Kennelly, J.) (granting prevailing party costs of obtaining a video deposition). The Court finds that these were taxable costs.

In sum, the Court taxes the defendants $3,376.15 of the $4,353.75 requested.

### 2. Copies

Next, the defendants argue that the majority of Cooper's copying cost requests are unsubstantiated and, therefore, unrecoverable. Cooper offers three receipts to

support his request for $1,326.85 in copying costs.  The defendants contest that one receipt—which merely states "Account Name:  Cooper Gary," "Black Printed Impressions  8174" and "Black Copied Impressions  293"—lacks any information to show that the $1270.05 in copies that the receipt represents were reasonably necessary to the litigation.  "[A] court cannot award copying costs unless it has some confidence that the costs are, in fact, recoverable, reasonable, and not incurred merely for the convenience of counsel." *Springer v. Ethicon, Inc.*, No. 17 C 3930, 2018 WL 1453553, at *17 (N.D. Ill. Mar. 23, 2018).

Cooper contends that this is the most information that the law firm's copier provides and that the Seventh Circuit only requires it "to provide the best breakdown obtainable from retained records." *Northbrook Excess & Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 643 (7th Cir. 1991).  Yet courts that have considered whether a bare-boned receipt like this is sufficient have concluded that it is not.  *See Springer*, 2017 WL 1453553, at *18 (denying copying costs to a party that "ma[de] no attempt to match the invoices to any particular set of documents or otherwise break down the expenses"); *Gracia v. Sigmatron Int'l, Inc.*, No. 11 C 7604, 2016 WL 6892861, at *7 (N.D. Ill. Nov. 23, 2016) (denying copying costs to a party whose "invoices do not say, even generally, what was copied or who the copies were provided to"); *Chi. Bd. Options Exch., Inc. v. Int'l Secs. Exch., LLC*, No. 07 C 623, 2014 WL 125937, at *8 (N.D. Ill. Jan. 14, 2014) (denying copying costs to party that did not "explain what the content and purpose of the copied documents were").  Cooper contends his counsel's approach to billing is permissible because defendants bill for copying the same way. This is no rejoinder, as the Court would have similarly declined to tax the defendants'

copying costs on this same basis had they prevailed. Because Cooper has not provided documentation or an explanation that would show that the copying costs were reasonably necessary, the Court declines to award all but the $56.80 in copying costs that the defendants do not contest.

### 3. Docket fees

Next, the defendants argue that the Court should not tax any of the $76.30 that Cooper incurred in docket fees.

The defendants contend that many of the docket fees resulted from unrelated dockets, as indicated by the PACER fees for cases other than the *Cooper* case. In response, Cooper contends that the searches that the defendants criticize were related to the case, as they all involve other cases that the defendants cited in legal argument. Additionally, the defendants contend that Cooper essentially searched the docket too frequently, as the docket was used multiple times in a day. But the Court declines to ration attorney use of the docket without a clearer indication of excessive use. Neither argument is sufficient to show that Cooper incurred costs based on unreasonable use of the docket.

However, the defendants rightly note that they should not be taxed for Cooper's counsel's use of PACER to download the same documents that they themselves uploaded. The Court agrees that such are not "reasonable and necessary to the litigation." *Little v. Mitsubishi Motors N. Am., Inc.*, 514 F.3d 699, 702 (7th Cir. 2008). The defendants do not expressly identify how much of Cooper's docket fees were unjustified in this way. The Court's review of Cooper's PACER invoice indicates that approximately eighty percent of the fees were reasonable; the Court therefore deducts

twenty percent and taxes the defendants $61.04 in docket fees.

### 4. Other costs

Finally, the defendants argue that several "other costs" were not recoverable. First, the defendants contend that Cooper cannot reasonably tax the $25.55 cost of a transcript for the January 18, 2017 hearing at which the parties discussed the defendants' motion to compel Cooper to turn over his Social Security number. In response, Cooper argues that plaintiff's counsel relied upon the transcript to prepare a motion for sanctions that was designed to discourage defense counsel from seeking the plaintiff's Social Security number, which is sensitive personal information a plaintiff understandably would wish not to disclose. The Court concludes that this is a reasonable cost. Second, the defendants assert that the $14 cost for Cooper's landlord's eviction file was unreasonable. This was plainly a reasonable cost. The landlord's dispute with Cooper was highly germane to the case, and the file could provide useful evidence. Last, the defendants contend that the cost of parking incurred by a witness at a deposition is not recoverable, but witness travel costs are appropriately taxable—and in Chicago, a parking fee of $7.55 is hardly unreasonable. *Majeske*, 218 F.3d at 825-26. The Court concludes that Cooper may tax the defendants for each of these costs.

Cooper requested $9,048.65 in costs. For the reasons just discussed, the Court taxes the defendants $6,785.74 in costs. Appendix 1 presents the Court's calculations in tabular form.

### B. Attorney's fees

Cooper has also requested $310,666.25 in attorney's fees. Federal law provides

29

that the prevailing party in a section 1983 case may obtain "a reasonable attorney's fee." 42 U.S.C. § 1988(b). To assess the proper amount of attorney's fees, the Court first calculates the "lodestar amount," which is obtained "by multiplying the reasonable number of hours expended by a reasonable hourly rate." *Spellan v. Bd. of Educ. for Dist. 111*, 59 F.3d 642, 645 (7th Cir. 1995). Thus the Cooper must supply the Court with both the number of hours expended and his attorneys' rates. The defendants contest both.[8]

### 1. Hours

The defendants first contend that the hours that for which Cooper's attorneys seek compensation are unreasonably high. "[T]he district court has an obligation to exclude from this initial fee calculation hours that were not reasonably expended on the litigation." *Spegon v. Catholic Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999) (internal quotation marks omitted). The defendants object to the time that Cooper's attorneys billed on numerous grounds. These objections can be grouped into three categories: (1) unnecessary activity; (2) administrative tasks not properly done by a lawyer; and (3) duplicative effort.

First, the defendants contend that Cooper's attorneys billed for unnecessary activities. The defendants first point to Cooper's attorneys' work on motion *in limine* number 13. Cooper's attorneys attempted to argue that they should be able to tell the jury that the City of Chicago had deleted the 911 call recordings associated with this case (albeit through an automatic deletion process). The Court declined to grant the motion after a hearing and, as the record indicates, stated that this was not a viable

---

[8] Neither party argues for a variation from the lodestar.

argument at the time it was made. The Court must exclude billed hours that were "unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The defendants contend that this warrants excluding a total of 5.3 hours for attorneys Hamilton and Turkcan. This is an overbroad request, as the defendants' request would sweep up time that went to other motions *in limine*. Because motion *in limine* number 13 represented a relatively small fraction of Cooper's overall motion *in limine* argument, the Court deducts 1.0 hours from both Hamilton and Cooper's time.

Next, the defendants contend that the time spent on Cooper's motion to reconsider the Court's denial of partial summary judgment was unnecessary. Cooper's motion was unsuccessful—but that is not the end of the analysis. Cooper had moved for partial summary judgment on whether Clyne's entry into the apartment was justified by exigent circumstances. The Court held that there were factual disputes that precluded summary judgment. D.E. 74 (Apr. 27, 2017 Minute Entry). Cooper moved for the Court to reconsider that decision. Though this motion was denied, it was anything but frivolous. Cooper had colorable reasons to move the Court to reconsider.

Next, the defendants argue that the time Cooper's attorneys spent on a proposed Rule 11 motion that was never filed cannot be included in the fee petition. As Cooper notes, this puts the defendants in the curious position of "tak[ing] issue with the fact that Cooper did *not* file a motion for discovery sanctions against them." Pl.'s Reply in Supp. of Pet. for Att'ys' Fees at 8. But what Cooper did here—present opposing counsel with the Rule 11 motion before taking it to the Court—is what the Federal Rules and circuit precedent contemplate. Fed. R. Civ. P. 11(c); *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 808 (7th Cir. 2003). Moreover, the underlying issue was significant: plaintiff's

counsel were attempting to protect Cooper's Social Security number—sensitive personal information—from being produced as part of discovery. These were reasonably expended hours that Cooper may include.

Last, the defendants present challenges to fifteen individual time entries, most of which consist of individual six-minute increments. Cooper conceded defendants' fourth, fifth, sixth, eighth, ninth, and tenth points, so the Court excludes 5.1 hours from Hamilton's time. The remaining points are a good deal less convincing. For instance, the defendants contend that time billed in relation to an e-mail captioned "preparing JSR" must be irrelevant, because there were no parties with the initials "JSR." JSR stands for "joint status report," Cooper responds, and it is plainly reasonable for two attorneys to confer on the preparation of joint status report. The Court reviewed the defendants' remaining challenges and declines to exclude any additional hours for these flyspeck challenges.

The Court next considers the defendants' objections to what they consider to be hours billed for "administrative tasks." "Courts have found organizing file folders, preparing documents, copying documents, assembling filings, electronically filing documents, sending materials, docketing or 'logging' case events into an internal case tracking system, and telephoning court reporters to be [administrative]." *Montanez v. Simon*, 931 F. Supp. 2d 869, 881 (N.D. Ill. 2013). Cooper's counsel submitted nearly 90 pages of timesheets. To indicate which tasks are administrative in nature, the defendants marked individual entries with a blue asterisk and provided no other explanation. But the Court has previously stated that such "perfunctory" objections are usually waived, as the Court "will not[] comb through the spreadsheets to try to cull out

32

and then analyze the particular entries that defendants contend involve administrative work." *Fields v. City of Chicago*, No. 10 C 1168, 2018 WL 253716, at *9 (N.D. Ill. Jan. 1, 2018). The Court declines to exclude any time on this ground.

Duplicative time entries—those involving redundant or repeated efforts between multiple entries—may not be reasonably billed. Defendants rely upon this argument in their third and final argument to reduce the time requested by Cooper's attorneys. "The Seventh Circuit has cautioned that 'the tendency of law firms to overstaff a case should cause the trial court to scrutinize a fees petition carefully for duplicative time.'" *Gibson v. City of Chicago*, 873 F. Supp. 2d 975, 989 (N.D. Ill. 2012) (quoting *Jardien v. Winston Network, Inc.*, 888 F.2d 1151, 1160 (7th Cir. 1989)). But although "overstaffing cases inefficiently is common," "efficiency can sometimes be increased through collaboration." *Schlacher v. Law Offices of Phillip J. Rochte & Assocs., P.C.*, 574 F.3d 852, 858 (7th Cir. 2009). Indeed, "[t]he practice of law often . . . involves significant periods of consultation among counsel." *Tchemkou v. Mukasey*, 517 F.3d 506, 511-12 (7th Cir. 2008).

The defendants contend that much of the time for which Cooper's attorneys billed was spent in meetings or communication with other lawyers, which needlessly multiplied the total time in the case. They first note that, in one meeting, three attorneys billed different amounts of time for the meeting. Cooper concedes the differential and has agreed to reduce the time that Hamilton and Turkcan billed by one hour respectively.

The defendants next argue that there is far too much internal communication and duplicated effort: they highlight *all* communication between attorneys and collaborative projects. They request that, in addition to all the previous proposed reductions, "each

33

timekeeper's requested time be further reduced by 40% in light of the excessive internal communication and duplicative entries." Defs.' Resp. to Pl.'s Pet. for Att'ys' Fees at 16. But "[t]alking through a set of authorities or seeking advice on a vexing problem is often more efficient than one attorney's trying to wade through the issue alone." *Tchemkou*, 517 F.3d at 511-12. The Court does not see a basis, in this case, for a blanket reduction along the lines that defendants propose. To put it another way, based on the Court's review of the time records and its understanding of the case, defendants have not shown a *pattern* of excessive conferring that would warrant an overall percentage reduction. The Court declines to reduce Cooper's hours for duplication of effort on this basis alone.

To sum up the above discussion, the Court reduces Hamilton's time by 6.2 hours and Turkcan's time by 2.1 hours.

### 2. Rate

Next, the defendants contest the rates that Cooper proposes for his attorneys. The Court must find each attorney's "reasonable hourly rate." *Spellan*, 59 F.3d at 645. If entitled to attorney's fees, a prevailing party can either seek fees based on the attorney's current rates or on past rates plus interest. *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 317 F.3d 738, 744-45 (7th Cir. 2003). Cooper proposes to use his attorneys' current rates.

"A reasonable hourly rate should reflect the attorney's market rate, defined as the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question." *Small v. Richard Wolf Med. Instruments Corp.*, 264 F.3d 702, 707 (7th Cir. 2001). To assess that fee, the Court

presumptively adopts "[t]he attorney's actual billing rate for comparable work." *Spegon*, 175 F.3d at 555. But if that information is unavailable, the Court must look to "the next best evidence," which "includes evidence of rates similarly experienced attorneys in the community charge paying clients for similar work and evidence of fee awards the attorney has received in similar cases." *Id.*

Cooper proposes the following rates: $475 for Torreya Hamilton, $400 for Damon Cheronis, $250 for Kevin Turkcan, $200 for Colleen M. Shannon, and $125 for a paralegal. The Court adopts the plaintiff's proposed rates for Cheronis and the paralegal, as the defendants do not contest these. The defendants challenge the remaining rates.

### a.    Hamilton

First, the defendants argue that Hamilton is not entitled to the $475 hourly rate she requests, but instead is entitled to ten dollars less, $465. In support of her proposed rate, Hamilton notes that she has practiced law for approximately 22 years and is admitted to practice in the Northern and Central Districts of Illinois, as well as the Seventh Circuit. D.E. 174, Pl.'s Ex. A ¶ 1 (Hamilton Decl.). She was a prosecutor with the Cook County State's Attorney's Office, served as Assistant Corporation Counsel for the City of Chicago, and, in 2006, opened her own civil rights practice. *Id.* ¶¶ 3-5.

The defendants point out that Hamilton received $465 in the last case in which her fee was set, *Bellamy v. City of Chicago*, No. 15 C 2678, 2017 WL 3675729 (N.D. Ill. Aug. 25, 2017). They contend that rate is appropriate, as her work in *Bellamy* overlapped with this case. That is true, but just barely: *Bellamy* began in March 2015 and extended to a June 2016 verdict; this case began in March 2016 and extended to

35

July 2018. As these cases occurred over largely distinct consecutive periods, and Hamilton has gained additional experience, an increase in her rate to $475 is appropriate. Moreover, an increase would be consistent with past courts that noted improvements in her practice. *See Baker v. Ghidotti*, No. 11 C 4197, 2015 WL 1888004, at *4 (N.D. Ill. Apr. 24, 2015) (noting Hamilton's previous rates of $395 to $425 and approving $450 per hour), *aff'd in part, vacated in part on other grounds sub nom. Baker v. Lindgren*, 856 F.3d 498 (7th Cir. 2017); *Richardson v. City of Chicago*, No. 08 C 4824, 2012 WL 6185867, at *11 (N.D. Ill. Nov. 20, 2012) (approving $425 per hour), *adopted in part by Richardson v. City of Chicago*, No. 08 C 4824, 2013 WL 2451107 (N.D. Ill. June 5, 2013).

### b. Turkcan

Second, the defendants argue that the appropriate rate for Turkcan is $215 per hour, not the $250 rate he requests. Turkcan has practiced law since 2013 and is admitted to practice in the Northern and Central Districts of Illinois. D.E. 174, Pl.'s Ex. C ¶ 1 (Turkcan Decl.). He has worked in the Hamilton Law Office since 2013 and has appeared in or worked on 76 federal civil rights cases and several in state court. *Id.* ¶ 5. As with Hamilton, the most recent case in which Turkcan's rate was set was *Bellamy*, in which Judge Chang set Turkcan's rate at $200 per hour. But Judge Chang noted that Turkcan failed to provide any evidence justifying an increase since his previous rate, which was set in 2015. *Bellamy*, 2017 WL 3675729, at *5. Thus Turkcan's rate in *Bellamy* may reflect a failure of proof, rather than an assessment of his market value based on all the evidence.

Since that time, Turkcan has gained experience. He also submitted two

declarations from civil rights practitioners, both of whom affirmed that $250 per hour would be consistent with rates in the civil rights legal community for an attorney of his experience and ability. The Court concludes that Cooper has sufficiently supported the requested rate for Turkcan's time.

### c.  Shannon

Third, the defendants contend that Shannon only warrants $150 per hour. Although Cooper contends that a rate of $200 per hour is appropriate given Shannon's level of experience, the Court cannot so find, as there is a complete failure of supporting evidence. Cooper has not submitted a declaration from Shannon or from any other attorneys who can attest to her rate, nor has Cooper provided any information regarding what rates Shannon has previously obtained. *See Bellamy*, 2017 WL 3675729, at *6 (providing $150 per hour to an attorney who "utterly failed to meet her burden" of proving her rate).

In sum, the Court finds that Hamilton is entitled to a rate of $475 per hour, Turkcan is entitled to $250 per hour, and Shannon is entitled to $150 per hour. The lodestar calculation requires the Court to multiply these rates by the reasonable hours identified above, for a total fee award of $306,793.75. Appendix 2 presents this calculation in tabular form.

### C.  Writ of execution

Finally, Cooper has moved for a writ of execution to enforce the judgment and for post-judgment interest. "A money judgment is enforced by a writ of execution[.]" Fed. R. Civ. P. 69(a)(1). A motion to collect a judgment through garnishment is an ancillary proceeding, not a separate suit. *Yang v. City of Chicago*, 137 F.3d 522, 524-25 (7th Cir.

1998).  The defendants contend that the motion is premature given the post-trial

motions.  Because these now have been resolved, the Court considers Cooper's

request.

Under Illinois law, a creditor collecting a judgment may garnish up to 15 percent

of the debtor's gross income.  735 ILCS § 5/12-803.  Cooper has proposed to garnish

15 percent of each defendant's monthly income:

| Defendant | Monthly income | Garnishment |
|---|---|---|
| Clyne | $ 7,779.50 | $ 1,166.93 |
| Ja | $ 8,005.00 | $ 1,200.75 |
| Papadopoulos | $ 7,779.50 | $ 1,166.93 |
| Schmidt | $ 8,999.00 | $ 1,349.85 |
| Schneider | *Pursued in separate proceeding* | |

The defendants do not dispute Cooper's general figures or calculation.  They

contend, however, that Cooper wrongly included contributions to pension and retirement

systems and child-support payments as part of the defendants' gross income, even

though Illinois law requires these payments be deducted when calculating garnishment.

735 ILCS 5/12-804 (exempting income directed to pension or retirement fund

contributions from garnishment); *In re Marriage of Schomberg*, 2016 IL App (3d) 160420

¶ 24 (limiting the total amount of garnishment when the combined total of payments

going to child support and court judgments exceed a statutory threshold).  But the

defendants do not supplement this argument with any evidence that the individual

defendants are actually making retirement or child support payments.  And even if such

payments are being made, the defendants have failed to offer alternative garnishment

amounts.  Thus the Court enters the writ of execution in Cooper's favor.  The

defendants are free to file a motion to reconsider with adequate information to support a

revised calculation.  The Court stays execution for fourteen days from the date of this order, but any request for a further stay beyond that will require an appropriate motion.

Finally, post-judgment interest under 28 U.S.C. § 1961(a) has accrued as a matter of law from the date the judgment was entered.  The Court need not calculate that amount here.

## Conclusion

For the foregoing reasons, the Court denies the defendants' motion for judgment as a matter of law, a new trial, or to alter the judgment [dkt. no. 153].  The Court grants plaintiff's bill of costs in the amount of $6,785.74 and petition for attorneys' fees in the amount of $306,793.75 [dkt. nos. 146, 174].  The Court also grants plaintiff's motion for a writ of execution [dkt. no. 164] but stays execution through September 4, 2018.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 20, 2018

## APPENDIX 1

| Cost | Claimed amount | Revised amount |
|---|---|---|
| Clerk fees | $ 400.00 | $ 400.00 |
| Summons / subpoena | $ 1,040.00 | $ 1,040.00 |
| Transcripts | $ 4,353.75 | $ 3,376.15 |
| Printing | $ - | $ - |
| Witnesses | $ 45.35 | $ 45.35 |
| Copies | $ 1,326.85 | $ 56.80 |
| Docket fees | $ 76.30 | $ 61.04 |
| Other costs | $ 1,806.40 | $ 1,806.40 |
| **Total costs** | $ 9,048.65 | $ 6,785.74 |

## APPENDIX 2

| Lawyer | Claimed hours | Claimed rate | Claimed total | Revised Hours | Revised rate | Revised total |
|---|---|---|---|---|---|---|
| Torreya L. Hamilton | 352.3 | $ 475.00 | $ 167,342.50 | 345.2 | $ 475.00 | $ 163,970.00 |
| Damon M. Cheronis | 79.8 | $ 400.00 | $ 31,920.00 | 79.8 | $ 400.00 | $ 31,920.00 |
| Kevin T. Turkcan | 311.3 | $ 250.00 | $ 77,825.00 | 309.3 | $ 250.00 | $ 77,325.00 |
| Colleen M. Shannon | 155.3 | $ 200.00 | $ 31,060.00 | 155.3 | $ 200.00 | $ 31,060.00 |
| Paralegal | 20.15 | $ 125.00 | $ 2,518.75 | 20.15 | $ 125.00 | $ 2,518.75 |
| **Total** | | | $ 310,666.25 | | | $ 306,793.75 |